Steven Allen **RUTHERFORD** and Michael Rutherford, Plaintiffs–Appellants,

and

Liberty Mutual Insurance Company, Intervening Plaintiff–Appellant,

v.

**POLAR TANK TRAILER, INC., A.P.A.C. Tennessee, Inc., Harrison Construction Company, Inc., et al., Defendants–Appellees.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

March 3, 1998.

Permission to Appeal Denied by Supreme Court Sept. 14, 1998.

Byron D. Bryant, Knoxville, for Plaintiffs–Appellants.

Gerald L. Gulley, Jr., Baker, McReynolds, Byrne, O'Kane, Shea & Townsend, Knoxville, for Intervening Plaintiff–Appellant.

Jay Arthur Garrison, Kennerly, Montgomery & Finley, P.C., Knoxville, for Defendant–Appellee, Polar Tank Trailer, Inc.

## OPINION

FRANKS, Judge.

In this products liability action the defendant was granted summary judgment and plaintiffs have appealed.

The injuries occurred on July 15, 1993, when plaintiff Michael Rutherford, a truck driver for Shore Truck Lines ("Shore") was delivering molten asphalt to a division of A.P.A.C.-Tennessee ("APAC") in Hayesville, North Carolina. The asphalt was transported in an insulated cylindrical trailer tank manufactured by defendant Polar Tank Trailer, Inc. ("Polar"). The tank had a lid or hatch on top and a valve on the bottom rear.

Rutherford had worked for Shore about three years and had been hauling asphalt for several weeks. Shore allowed Michael's nephew, Steven Rutherford, to accompany Michael on the APAC delivery. After reaching the APAC facility, Michael connected APAC's hose to the back of his trailer. The hose was also connected to APAC's pump. Michael inspected the hose and found no defects. He then opened the valve, turned on the pump and began to unload the asphalt. The gasket on the hose began to leak and drip asphalt during the unloading. Michael testified that the total loss caused by the leak would have been approximately one gallon of the 6,000 gallon load.

Michael notified an APAC employee of the leak and the employee asked Michael to change the gasket. He then attempted to change the gasket while the unloading process was underway. He had observed other drivers change the gaskets in the middle of unloading previously. Michael did not completely close the flow valve because he believed that APAC's pump would stall out if he turned the valve all the way off. He left the valve partly open as he uncoupled the hose to allow airflow into the line. At that point Steven was supposed to turn the valve all the way off. When Michael began to disconnect the hose, hot asphalt spewed from the tanker, injuring both Rutherfords.

■■■ We conclude for reasons hereinafter stated, that the Trial Court erred in granting summary judgment because plaintiffs' expert's affidavit raises factual issues

that must be resolved. When evaluating a motion for summary judgment, the Trial Court should consider "1. Whether a factual dispute exists; 2. Whether the disputed fact is a material outcome of the case; and 3. Whether the disputed fact creates a genuine issue for a trial". *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn.1993). We are required to view the evidence in the light most favorable to the opponent of the motion and all legitimate inferences of fact must be drawn in favor of the opponent of the motion. *Gray v. Amos*, 869 S.W.2d 925 (Tenn.App.1993).

■ In order to prevail under Tennessee's Products Liability Act, a plaintiff must show that the product was in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller. *See* T.C.A. § 29–28–105(a). In this case, plaintiffs offered an expert affidavit stating that the flow valve on the tanker was unreasonably dangerous and did not contain bleed vents downstream of the ball cock. Defendant countered with its own expert affidavit stating that the valve was not unreasonably dangerous.

T.C.A. § 29–28–102(8) provides:

"Unreasonably dangerous" means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller assuming that he knew of its dangerous condition.

T.C.A. § 29–28–105(d) states, however, that "a product is not unreasonably dangerous because of failure to adequately warn of a danger or hazard that is apparent to the ordinary user."

■ Thus, the statute provides two tests for determining whether a product is unreasonably dangerous. *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527 (Tenn.1996). Under the "consumer expectation test," a product "is not unreasonably dangerous if the ordinary consumer would appreciate the condition of the product and the risk of injury."

*Id.* at 530. The prudent manufacturer test "imputes knowledge of the condition of the product to the manufacturer." *Id.* "The test is whether, given that knowledge, a prudent manufacturer would market the product." *Id.* (Citations omitted). These two tests are "neither mutually exclusive nor mutually inclusive." *Id.* at 531.

Defendants argue that it is entitled to judgment under the consumer expectation test because the hazard was obvious. The record shows that Michael Rutherford was aware that hot asphalt could spew out of the valve if the valve was left open. He testified that he was aware that if the valve was not completely closed, it meant asphalt was still flowing out of the trailer. He mistakenly believed that he had closed the valve enough to limit the flow and pressure.

■ Under the prudent manufacturer test, however, the consumer's expectations are irrelevant. *Ray*, 925 S.W.2d 527, 531. This test "requires proof about the reasonableness of the manufacturer or seller's decision to market a product assuming knowledge of its dangerous condition." *Id.* The Products Liability Act "does not limit the application of either test to only certain kinds of actions." *Id.* at 533.

In *Ray*, the plaintiffs alleged that a cigarette lighter was unreasonably dangerous because a prudent manufacturer would not market such a product without a child safety device. The court noted that it was "unquestionable" that the defendants would be entitled to summary judgment under the consumer expectation test since "[a]n ordinary consumer would expect that a cigarette lighter, left in the hands of a young child, could cause danger and injury concomitant to that occurring in this case." *Id.* at 530. According to the court, "[t]he more difficult question is whether that conclusion ends the inquiry." *Id.* The court determined that "unquestionably, it does not." *Id.*

Under the prudent manufacturer test, there are unresolved issues of fact. The Appellants' expert opined that the valve was unreasonably dangerous for off-loading pump loads and for making adjustments while off-loading. He stated that "Valves, with bleed

vents downstream of the ball cock were available commercially at modest cost prior to this accident." His affidavit conflicts with the defendants' expert's affidavit.

Defendants argue that the affidavit is deficient because the Plaintiffs' expert did not directly state that using bleed vents would have prevented the accident. In *Ray*, the plaintiffs' expert stated that child safety devices would more likely than not have prevented the injuries. While the Plaintiffs' expert did not explicitly link the bleed vents with preventing accidents, this is the clear meaning of his statement. The statement concerning bleed vents follows directly after his statement that the existing valve system was defective and unreasonably dangerous.

 While plaintiffs' expert's affidavit did not directly state that a prudent manufacturer or seller would not put this product on the market, his statements concerning the availability of bleed vents, and their low cost, however, implicate the kind of "risk-utility" balancing that is part of the prudent manufacturer test. The prudent manufacturer test involves balancing various factors including:

(1) The usefulness and desirability of the product—its utility to the user

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintains its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer of spreading the loss by setting the price of the product or carrying liability insurance.

*Ray,* 925 S.W.2d at 533 n. 10 (citing Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 837–38 (1973)).

We conclude the Trial Court erred in granting summary judgment. Plaintiffs' expert's affidavit raises material factual issues under the prudent manufacturer test, and we vacate the summary judgment and remand for further proceedings consistent with this opinion.

The cost of the appeal is assessed to the appellees.

DON T. MCMURRAY and CHARLES D. SUSANO, Jr., JJ., concur.