Dean E. MARTIN, et ux, Plaintiffs,

v.

MICHELIN NORTH AMERICA, INC., Defendant.

No. 3:96–CV–635.

United States District Court, E.D. Tennessee at Knoxville.

April 6, 2000.

W. Holt Smith, Madisonville, TN, James M. Webster, Oak Ridge, Donald R. Elledge, Shattuck & Elledge, Clinton, TN, for Dean E. Martin, Elizabeth A. Martin, plaintiffs.

Darryl G. Lowe, Lowe, Shirley & Yeager, Knoxville, TX, Richard H. Willis, Nelson, Mullins, Riley & Scarborough, Atlanta, GA, Michael D. O'Connell, Matthew W. Den Ouden, O'Connell, Flaherty & Attmore, Hartford, CT, Joel H. Smith, Robert H. Brunson, Courtney A. Crook, Nelson,

Mullins, Riley & Scarborough, Columbia, SC, for Michelin Tire Corporation, defendants.

## *MEMORANDUM OPINION*

MURRIAN, United States Magistrate Judge.

This matter is before the undersigned in connection with defendant Michelin North America, Inc.'s motion for judgment as a matter of law or, in the alternative, for a new trial [Doc. 247]. The plaintiffs have responded and the defendant has filed a reply brief [Docs. 253, 254, 255]. Oral arguments were heard on March 31, 2000. For the reasons stated below, the motion will be denied.

This products liability case was tried before the undersigned and a jury over six trial days beginning Monday, January 24 and ending January 31, 2000. The jury returned a verdict in favor of plaintiff, Dean Edward Martin, in the amount of $1.3 million and in favor of his wife, Elizabeth Martin, in the amount of $200,000. The jury assessed 30% of the fault against Mr. Martin which resulted in a net recovery by Mr. Martin of $910,000 and a net recovery by Mrs. Martin of $140,000. The undersigned granted the motion for judgment as a matter of law made at the close of the plaintiffs' proof by Michelin North America, Inc. ("Michelin") in regard to the claim for punitive damages.[1]

Following the trial of this matter, Michelin has renewed its Fed.R.Civ.P. 50(b) motion for judgment as a matter of law and has moved, pursuant to Fed. R.Civ.P. 59(a) and (b), for a new trial. Michelin's requests for judgment as a matter of law or for a new trial are based on five grounds and will be dealt with seriatim below after a brief statement of the factual background of the case.

### I. *Factual Background* [2]

This is a products liability action brought pursuant to the Tennessee Products Liability Act of 1978, Tenn.Code Anno. § 29–28–101, *et seq.*, for injuries and damages suffered when a Michelin 16″ light truck tire burst on July 6, 1995, in Mr. Martin's automobile repair shop located in Knoxville, Tennessee. At the time of the accident Mr. Martin was twenty-seven years old, self-employed in a fledgling automobile repair business and wrecker service with his brother and he was in good health. He is a high school graduate who did very well in vocational studies to be an automobile mechanic. He is an experienced tire mounter and was aware of the dangers inherent in mounting 16″ tubeless light truck tires like the one in question and, more specifically, he knew that it was dangerous to mount a 16″ light truck tire on a 16.5″ rim. There is no dispute that Mr. Martin put a used 16″ radial Michelin tire on a 16.5″ Budd wheel and the tire burst, injuring him.

Mr. Martin testified that the wheel was painted gray when he sent it to his lawyers, but that the paint "got scraped off" after he turned it over to them. Tr. at 29, January 26, 2000, A.M. Session. None of the attorneys or other witnesses can account for this testimony and the attorneys assured the undersigned that the wheel was in the same condition as it had been just after the accident. In fact, Mr. Martin acknowledged that his attorney showed him the 16.5″ marking on the wheel during

---

1. Transcript of Proceedings, January 27, 2000, A.M. Session at 26. Hereinafter, references to the transcript will be as follows: Tr. at _____, January _____, _____ Session.

2. Under Fed.R.Civ.P. 50(a), judgment as a matter of law may be granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue ...." In deciding whether to grant a motion for judgment as a matter of law, the court must apply Tennessee law, which requires the trial court to "take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, [and] discard all countervailing evidence ...." *Arms v. State Farm Fire and Cas. Co.*, 731 F.2d 1245, 1248 (6th Cir.1984) (quoting *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn.1977)). Accordingly, this statement of facts will take the strongest legitimate view of plaintiffs' evidence.

early preparations of the case. *Id.* at 32–33.

Mr. Martin measured the wheel with a tape measure and it measured 16″, but he was not satisfied with that. He took it to a local tire store and asked a man by the name of Billy Owens to measure it for him. Mr. Martin had an agreement with the tire store to service their trucks and so he was there quite often and knew the employees. Mr. Martin testified that Billy Owens used a set of calipers and confirmed that it was a 16″ wheel. *Id.* at 64.

He testified that he followed normal mounting procedures, aired the tire up to 68 psi, then reduced the pressure to 60 psi—the pressure at which he intended to operate the tires on his truck. He described the seating of the tire bead[3] as follows:

> And, like I said, when this tire seated and everything, I heard the pops, but it wasn't a real loud pop, which I looked at it and it all looked like it was seated around to me. I mean, it looked like the flanges was up where they was supposed to be against the wheel.

*Id.* at 28. The tire "went on easy," according to Mr. Martin, but the normal "pop" when the bead seated was not as loud as usual. *Id.* at 80.

He testified that he did not have a tire safety cage in his shop and so he chained the tire to a heavy vehicle while mounting it. *Id.* at 27. After he mounted the tire on the wheel, he unchained it, left it lying on the shop floor and went to lunch. *Id.* at 41. Chaining a tire to a fixed object while mounting it is considered an acceptable method of avoiding accidents like the one in question here.

When Mr. Martin returned from lunch about two hours later with a truck to work on that belonged to the tire store, he stopped by the battery shop across the street and talked to Mike Holsenback and John Gaddis for a short time. *Id.* at 42, 96. He testified that he remembers going

back to his shop and going in, but does not remember anything after that until he remembers being in a rehabilitation center at a hospital. *Id.* at 42–44. He had lost two fingers on his (dominant) right hand, his left wrist and hand were injured seriously and he had suffered a serious head and left eye injury. The tire hit him in the face—in the area of his jaw, nose and left eye. His mental abilities have been permanently reduced.

The trauma to his right hand involved a transection of the neurovascular bundles with vascular compromise to the third and fourth fingers as well as a deep palm laceration. Plaintiff's Exhibit 38. The trauma to his left hand involved a deep wrist laceration with vascular compromise to his hand, loss of lunate, triquetrium and half of scaphoid carpal bones in his wrist as well as a transection of his ulnar and radial arteries. Plaintiff's Exhibit 38. He suffered multiple facial lacerations, a left maxillary sinus fracture and a subarachnoid hemorrhage in his brain. Plaintiff's Exhibit 42. Needless to say, his physical and mental injuries included injuries that are permanent. His medical bills totaled $133,074.32. The seriousness and permanency of Mr. Martin's injuries are not disputed by Michelin.

Mr. Martin testified that he had left the tire in the floor right where he aired it up before he left for lunch and that it would have been necessary to move the tire before working on the truck that he brought back from the tire store after lunch. *Id.* at 48. But, there are no eyewitnesses to what happened when the tire burst because Mr. Martin was alone and he cannot remember. He has amnesia. The physical evidence supports Michelin's theory that Mr. Martin was standing over the tire when it burst and even supports an inference that his right hand was at or near the valve stem at that time. The tire put an imprint on an overhead steel beam and so

---

**3.** The "bead" is that part of a tire which is designed to hold the tire against the rim of the wheel so that the tire holds air.

it obviously failed while lying flat on the concrete floor. When the tire cord on the underside of the tire ruptured, the tire was shot like a missile into the overhead beam. It had to be the underside cord that broke, since the cord break was what launched the tire off the concrete floor.

At the time of the accident, Michael Holsenback worked at a used battery business across the street from Mr. Martin's automobile repair shop. He described a brief conversation that Mr. Martin had with him and John Gaddis in the early afternoon on July 6, 1995, at the battery shop. At least one garage door at Mr. Martin's shop was open and the garage door opening on to the street at the battery business was open. Tr. at 45, January 25, P.M. Session. Mr. Holsenback testified that Mr. Martin walked across the street to his shop and he heard a loud explosion. *Id.* at 46.

Q. All right. So from the time that he walked across that street till you heard the explosion was how long now?

A. It had to have been less than a minute, because I know me and John were still standing the same place when we heard it as we were when we were talking to him.

Q. In your opinion, would Eddie have had time to do any work between that time?

A. Not much. He had enough time to walk across the street and get in the building, basically, not much more than that.

*Id.* at 47–48. Mr. Holsenback and Mr. Gaddis ran to Mr. Martin's shop and found him lying on the floor seriously injured.

Mr. Gaddis testified that the time between the end of his and Mr. Holsenback's conversation with Mr. Martin and the sound of the explosion after Mr. Martin crossed the street to his shop was "very short, very short. I mean, maybe a minutes." *Id.* at 58. He added that he did

not think Mr. Martin had time to do any work before the explosion occurred. *Id.* at 59. He said that he could not recall hearing the air compressor running when he first went to see if Mr. Martin was hurt. *Id.*[4]

The tire in question was a used 16″ light truck radial tire. It had been manufactured in January, 1990 by Michelin and sold by it. It contained a 19–strand cable bead.

It would be speculative to say what happened in the shop just before the tire burst. No one really knows. It is clear that Mr. Martin must have been standing over it at the time and there was evidence, based on his injuries and damage to the valve stem, from which the jury would have concluded that Mr. Martin was adding air to the tire at that time. Of course, the plaintiffs' proof was that it needed no further airing up since Mr. Martin had left it at normal operating pressure (60 psi) before he went to lunch. To do the damage it did, the tire must have been lying flat on the concrete floor when it burst and it must have been the lower cord that burst. The floor would have acted as a springboard from which the tire catapulted.

The plaintiffs established that the tire in question will burst in a mismatch situation (16″ tire on a 16.5″ wheel) at pressures within the normal operating range for the tire—65 to 80 psi.

## II. *Testimony of Dennis Carlson*

Michelin contends that the court erred in allowing some or all of Dennis Carlson's testimony because:

Plaintiffs' expert, Dennis Carlson, should not have been permitted to offer any opinion testimony, as his opinions do not satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125

---

4. The point plaintiffs were trying to make with the compressor not running was to counter Michelin's argument that the jury should infer from the injuries and physical evidence

that Mr. Martin was bending over the tire and inflating it when it exploded. The compressor may not always run when air is being drawn from its storage tank, however.

L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Alternatively, portions of Mr. Carlson's testimony were inadmissible and should have been stricken. The admission of this unreliable and inadmissible evidence can only be cured by a new trial.

    a.   Mr. Carlson should not have been permitted to give his "delayed burst" opinion, as it is by his own admission wholly untested, unreliable, speculative, and thus inadmissible pursuant to the *Daubert/Kumho Tire* standard.

    b.   Any effort by Plaintiffs to posit an "alternative" technical theory did not cure the prejudice caused by the admission of Mr. Carlson's "delayed burst" testimony in the first instance; moreover, the "alternative" theory ignores both the Plaintiffs' account of the accident and the forensic evidence, and as such is improper under *Daubert* and *Kumho Tire.*

Michelin has insisted all along that a major piece of plaintiffs' case is missing because plaintiffs cannot account under the laws of physics, basic engineering principles or otherwise for how a tire could be aired up to 68 psi, dropped to 60 psi, left for about two hours and then mysteriously burst while Mr. Martin was standing over it. Michelin contends that neither Carlson nor any other witness offered or could offer any rational explanation based on sound scientific engineering principles to explain such a strange phenomenon. Mr. Carlson conceded, on cross-examination, that he had never tested a tire to see if it would burst after being aired up to 68 psi, dropped in pressure to 60 psi and then left for two hours. Tr. at 113–14, January 25, P.M. Session. In fact, he testified that a burst under that set of facts would be

"against certain, shall we say, feelings you might have." *Id.* at 114. He said it was "not intuitively obvious that can happen. I don't know if it can happen or not." *Id.* at 141.[5]

    It is obvious to the undersigned from his testimony that Mr. Carlson was not trying to put forth a "delayed burst" theory to the jury. His direct examination included the following:

Q.  Mr. Carlson, I want to ask you if you have an opinion, within a reasonable degree of engineering certainty, as to whether in the context of the burst pressure in a 16–inch tire on a 16.5–inch rim, whether or not the Michelin 19–count bead is defective or unreasonably dangerous, defective being defined as a condition of a product that renders it unsafe for normal or anticipatable handling and consumption, unreasonably dangerous being defined as the product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with ordinary knowledge common to the community as to its characteristics or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller assuming that he knew of its dangerous condition. Assuming those facts do you have an opinion as to whether or not the 19 point Michelin tire, as it existed in this case the 235/85 XCH 4 in this case was defective or unreasonably dangerous?

A.  Yes, it was defective.[6]

Q.  Why is that?

A.  It fails prematurely in a mismatch situation, a foreseeable event.

5.  At the request of Michelin, this instruction was given the jury:

    You should consider all of the surrounding circumstances at the time of the event or occurrence when weighing the testimony of a witness. A statement of fact should be disregarded if you find the statement is inherently impossible or contrary to universally recognized physical laws or well established physical facts. Tennessee Pattern Jury Instructions § 2.25 (1997).

6.  Under Tennessee Products liability law, a manufacturer or seller can be held strictly liable if a product is defective or unreasonably dangerous. Tenn.Code Anno. § 29–28–105.

Q. I want you to assume some facts, sir. I want you to assume that Mr. Martin is totally wrong about what he said happened. I want you to just assume that Mr. Martin has absolutely no idea what happened and that and in accordance with the scenario that the defendant puts in this case that Mr. Martin at the time of this explosion is airing up this tire, he is standing over it, putting pressure in it and that he inflates it instead of the 68 PSI that he inflates it to somewhere between 80 and 100 PSI. You understand my question?

A. Yes.

Q. Do you have an opinion whether in that context this particular product is defective?

A. It is still defective.

Q. Why is that, sir?

A. It doesn't have the margin of safety that you need for a product. 100 PSI is too close to the operating pressure. It is commonly available, 100 PSI is commonly available to the general public. You would not design for the type of condition.

Q. Let's assume that Mr. Martin is correct in what he says happened, that he inflates it to 68 PSI. Let me go through all of the steps. That Mr. Martin testified that he has some tires that he has on another truck, that he takes those four Michelin tires off of that truck and is going to put them on another truck. That he successfully mounts two tires on rims, that he has one Michelin, he has two Michelin tires left and he gets one of the Michelin tires, this one in the situation here, that he goes and has another rim and that he takes, he measures that rim himself and then he takes that rim down to Free Service Tire store and has them measure it for him. That on the morning of this incident he mounts exhibit 1 on exhibit 3. That he inflates it, well, first he mounts it on there. He successfully buttonholes it on there, as we have talked about. He uses lubricant that we have talked about here, the Murphy's lubricant.

Is that a good lubricant, Mr. Carlson? Is that what this is for, to lubricate tire beads?

A. That is right.

Q. There he lubricates it, he runs a chain around the whole procedure, the whole thing and inflates it to 68 PSI, takes the chain off and lets it down to 60 PSI. He goes to lunch, comes back from lunch. Talks to John Gaddis and Mike Holsenback and walks over to there. At that point it explodes. We don't know exactly what happened. In that context is the tire defective or unreasonably dangerous?

A. Yes.

MR. DEN OUDEN: Objection. I didn't know Mr. Smith was finished. On the ground identified off the record. Just to preserve the record, Your Honor. There is no basis for this opinion. Mr. Martin has not yet testified. The only person reciting facts about the events leading up to the happening of the accident so far has been Mr. Smith.

THE COURT: Members of the jury, these are just assumptions that the expert is being asked to make. You will have to decide for yourself what the true facts are. The lawyers are entitled to ask him to assume certain things. You will be the judges of what the true facts are. Overrule the objection. You may answer.

Q. Answer the question, Mr. Carlson.

A. Yes, it is. The data showed it would blow at 65 PSI which is close to those numbers.

*Id.* at 101–04.

Carlson actually worked for Michelin's affiliate, Michelin Americas Research and Development Corporation ("MARC") from 1977 to 1987. MARC developed and tested tires for Michelin. He testified that he worked on the design of the tire that would later become the XCH4 Michelin radial at issue in this case. *Id.* at 68. He said that in the late 1970s or early 1980s while he worked at MARC feedback start-

ed coming from the field that there was a problem with consumers mounting 16″ tires on 16.5″ rims. *Id.* at 77.

He was involved in a test at MARC in which a 16″, 19–strand cable bead tire, like the one in question here, was placed on a 16.5″ rim and deliberately aired up until it burst. *Id.* at 80. This was in 1979 or 1980. It burst at 65 psi—within the normal operating pressure for the tire. *Id.* at 80–81. If placed on a 16″ rim, the same tire could be inflated to about 300 psi before it burst. *Id.* There was evidence that Michelin has known since the mid–1970s that 16″ tires were being mismounted on 16.5″ rims.

Carlson testified that Goodyear was manufacturing a tire with a single strand bead in the mid–1980s. *Id.* at 87. He testified that it was his opinion that it was scientifically and technologically feasible for tire manufacturers to have placed the single strand bead in its tires in January, 1990—the date the tire in question was manufactured. *Id.* at 88. Michelin does not dispute this; rather, it argues that no manufacturer knew that the single strand bead might be a "cure" [7] for the 16″ tire on 16.5″ rim mismatch problem in January, 1990, and that it did not have access to a "commercially available" single strand bead when it manufactured and sold the tire in question.

Carlson relied on a July, 1990 report from the University of Michigan Transportation Research Institute ("UMTRI") which involved burst tests performed on 42 tires. UMTRI took 16″ light truck tires (six tires from seven manufacturers), mounted them on 16.5″ rims and inflated them until they burst. *Id.* at 91. The Michelin cable bead tire burst at an average of 83 psi while the Goodyear Wrangler single strand bead tire burst at an average of 203 psi. *Id.* at 91. All six of the Michelin tires burst at pressures between 79.3 psi and 92.3 psi.

Rather than relying on a delayed burst theory, Carlson testified that regardless of which state of the facts the jury accepted (Mr. Martin's account of things or Michelin's assertion that Martin had to be standing over the tire and adding air when the accident happened), the tire was defective or unreasonably dangerous because: (1) there was a safer alternative design (the single strand bead) available under the existing state of the technological and scientific art when Michelin manufactured and sold the tire in question, (2) the Goodyear Wrangler tire had contained such a safer alternative product since the mid-nineteen eighties, (3) it was foreseeable that a 16″ tire would be incorrectly mounted on a 16″ rim, (4) Michelin's use of a 19–strand cable bead which had been shown to burst in a mismatch situation at normal operating pressures (65 to 80 psi), and (5) because there was no margin of safety engineered into Michelin's tire to protect tire mounters in foreseeable mismatch situations (*i.e.,* instead of bursting at 203 psi like the Goodyear tire, Michelin's tire bursts at less than 100 psi). *See id.* at 94, 102.

It was counsel for defendant who brought up a so-called delayed burst theory. First, he did so through Michelin's own expert, William Marchand, and during cross-examination of Mr. Carlson. Tr. 13–17, 113–14, January 25, P.M. Session. The hypothetical which plaintiffs' counsel presented to Mr. Carlson based on the anticipated testimony of Mr. Martin was not improper. The jury heard Mr. Martin testify to those facts later on in the trial. Mr. Martin was not giving an opinion as to what facts preceded the accident; rather, he presented his recollection of the facts and it was up to the jury to evaluate his testimony. Carlson did not attempt to establish any type of scientific basis for how the tire could have burst as Eddie Martin said it did.

---

7. By using the term "cure," I do not mean to imply that a manufacturer has a duty to design and sell a fail safe tire. The burden placed on manufacturers is to design and sell a tire which is not defective or unreasonably dangerous when it leaves the manufacturer's control under the state of the art then existing. Tenn.Code Ann. § 29–28–105(a) and (b).

There was "fit" between Carlson's testimony and the facts of this case. The Restatement (Third) of Torts § 2(b); states, in pertinent part, as follows:

> A product is defective when, at the time of sale or distribution, it ... is defective in design.... A product:
>
> \*     \*     \*     \*     \*     \*
>
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe....

Michelin does not deny that mismounting the tire in question on a 16.5″ rim poses a risk of harm. Plaintiffs proved that such mismounting was foreseeable. As early as 1975, the tire industry, and Michelin, knew that 16″ tires were being mounted on 16.5″ rims and that injuries were resulting. Tr. at 92–95, January 24, P.M. Session. Carlson himself ordered a burst test on Michelin's 19–strand bead radial tire in a mismatch situation in 1979 or 1980. This was while he worked at MARC, Michelin's affiliate that designed and tested tires for it. Tr. at 80–81, January 25, P.M. Session. The tire burst at 65 psi, which was within the normal operating pressure of the tire. Michelin has not made the argument that this burst test or the 1990 UMTRI burst tests lacked scientific or engineering validity. And so, the foreseeability of harm when a Michelin 19–strand cable bead radial tire is mounted on a 16.5″ rim and "aired up" to normal operating pressure and the foreseeability that it would happen from time to time were established by the plaintiffs.

> To establish a prima facie case of defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm Given inherent limitations on access to relevant data, the plaintiff is not required to establish with particularity the costs and benefits associated with the adoption of the suggested alternative design.

The Restatement (Third) of Torts § 2; cmt. f (1998). The plaintiff is not required to produce a prototype design in order to make out a prima facie case. *Id.* "[Q]ualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design *could* have been practically adopted at the time of sale." *Id.* (emphasis added). The fact that Goodyear had been using the single strand bead since the mid 1980s in its 16″ light truck tires was evidence which could have convinced the jury that the single strand bead was a "practical" alternative design.

Although plaintiffs proved that Goodyear had a single strand bead design incorporated into its Wrangler tire in the mid 1980s, there is no evidence that anyone in the tire industry knew that Goodyear's tire was a "cure" to the mismatch problem when Michelin manufactured and distributed the tire in question in January, 1990. But, that is beside the point. Michelin and other tire manufacturers are held to an expert standard of knowledge in the relevant manufacturing community at the time they put their tires on the market. *Id.,* cmt. a. The relevant question under the prudent manufacturer test is not what Michelin knew or should have known at the time it put the tire in question on the market; rather, the question is what *could* it have known as an expert in its field when it manufactured and sold the tire in January, 1990. Clearly, as demonstrated by Carlson's testimony, it was capable as early as 1979 of conducting burst tests in mismatch situations to see if a better, safer tire cord was available under the state of the scientific and technological art. It was left to a wheel manufacturer, Budd, to commission the 1990 UMTRI tests which showed that indeed there was a substitute product available in January, 1990 which would have met the same need as the

Michelin 19–strand tire and which would not be as unsafe in a foreseeable mismatch situation. *See Ray ex rel. Holman v. BIC Corporation,* 925 S.W.2d 527, 533 n. 10 (1996); *see Rutherford v. Polar Tank Trailer, Inc.,* 978 S.W.2d 102 (Tenn.App. 1998)(Jury question presented where plaintiff's expert stated in an affidavit that there was a substitute product available to defendant which would have cured the design defect).[8]

Michelin points out that plaintiffs did not prove that the 1990 UMTRI tests used Goodyear tires manufactured before January, 1990—the relevant state of the art date. That misses the point, however. The importance of the UMTRI tests is that they are evidence that the single strand bead design, which had been in use in the tire industry since the mid–1980s and which had been patented since the 1930s, Tr. 76, January 24, P.M. Session, was a reasonable and practical alternative design that could have prevented the plaintiffs' harm. Restatement (Third) of Torts § 2(b); and cmt. f (1998); *see also Rutherford v. Polar Tank Trailer, Inc., supra.*

Just because no one in the tire industry apparently recognized the single stand bead as a "cure" to the mismatch problem as of January, 1990 does not excuse Michelin from its failure to run burst tests and find out that the single strand bead could have prevented plaintiffs' harm.

> Industry practice may ... be relevant to whether the omission of an alternative design rendered the product not reasonably safe. While such evidence is admissible, it is not necessarily dispositive.

Restatement (Third) of Torts § 2(b); cmt. d. "[I]n most cases reasonable prudence is in fact common prudence; but strictly never its measure; a whole calling may have

unduly lagged in the adoption of new and available devices." The *T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.), *cert. denied sub nom. Eastern Transportation Co. v. Northern Barge Corp.,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

Michelin complains that the single strand bead was not commercially available to it in January, 1990. It was certainly available as a practical matter to its competitor, Goodyear. And again, the issue under the prudent manufacturer test is not what Michelin knew or should have known in January, 1990; rather, it is what it *could have known* under the existing state of technological and scientific art existing at that time. Certainly, a reasonable jury could have concluded that if the safer, alternative design (the single strand bead) was available to Goodyear, it could have been available to Michelin if Michelin had applied itself to testing and developing it.

Michelin stipulated that the single strand bead design was technologically feasible in January, 1990 in order to head off any ruling by the court that plaintiffs could inform the jury that Michelin converted to single strand beads in all of its 16″ light truck tires in 1997. *Cf.* Fed. R.Evid. 407 (subsequent remedial measures).

The undersigned exercised the gatekeeping role that is called for in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *See e.g., Memorandum and Order* filed June 15, 1999, at 2–10 [Doc. 162]; Tr. 1–65, January 25, A.M. Session. I will not repeat what I have

---

**8.** The expert's affidavit in *Rutherford* stated that a safer substitute product was "available commercially at modest cost prior to this accident." 978 S.W.2d at 105. The court interpreted the affidavit to state that the substitute product would have prevented the injury. The "prior to this accident" language is puzzling since the relevant state of the art date is the time of manufacture and sale of

the product. Tenn.Code Anno. § 29–28–105(b). The "available commercially" language was that of the expert. As indicated above, this is not a requirement under Tennessee law. Plaintiffs only have to prove that the alternative design was technologically feasible and practical at the time the product was manufactured and sold.

written and said about Mr. Carlson's competence to testify in this case; rather, it is incorporated by reference herein. His testimony was helpful to the trier of fact, it was relevant, and it was reliable. That is all *Daubert* and *Kumho* require. This case is not *Kumho* and Carlson appeared in this case as both a fact and expert witness. It is problematical for Michelin to assail him with regard to his testing and work he did at MARC since for at least part of the time he was working on the same tire design as is in question here and doing the work for the benefit of Michelin as a design engineer. His testimony was properly admitted.

### III. *The Ford Correspondence*

Michelin argues that the undersigned erred in admitting this evidence, stating as follows:

> Because [Michelin] received summary judgment on Plaintiff's failure to warn claim, the Ford Correspondence was irrelevant; any slight probative value on the issue of notice was vastly outweighed by the undue prejudice of the documents, which discussed historic events immaterial to the accident at issue. In addition, while a manufacturer's conduct may be an issue under the "prudent manufacturer" test, the Ford documents were not relevant to that issue, since they did not concern conduct that bore any material relationship to the accident in question.

This issue was explored thoroughly during a jury-out hearing involving the testimony of William M. Marchand, Michelin's corporate representative at trial. Tr. 99–116, January 24, P.M. Session. He is a senior technical advisor at Michelin. After a pretrial hearing conducted June 21, 1999, the undersigned had held that the Ford correspondence "has relevance to this case, but it will be up to the plaintiffs to authenticate it. Any other ruling will be left for trial." Order filed June 21, 1999 [Doc. 171].

Michelin contends that the Ford correspondence, plaintiffs' exhibits 9 and 10, should not have been admitted. It contends that the documents were not relevant to any of the issues before the jury and if they did have any relevancy, the probative value was substantially outweighed by the danger of unfair prejudice to Michelin. Fed.R.Evid. 401, 403. The Ford correspondence involves a series of letters between Michelin and the Ford Motor Company concerning Ford's insistence that Michelin include a warning on 16″ tires sold to Ford to the effect that such tires should be mounted only on approved 16″ rims. The plaintiffs offered the correspondence because Michelin was somewhat resistant to the idea. For example, in a letter dated April 5, 1982, from Michelin to Ford, Mike Coppersmith, Original Equipment Manager of Major Accounts, wrote as follows:

> Confirming the results of recent meetings and telephone conversations between Michelin personnel and Ford Purchasing, Michelin will agree to place the following marking in a visible position on both sidewalls of each LT Metric tire sold to Ford: "Mount Only On Approved 16 inch Rims."

> While Michelin sees no need for such marking on the tires, we will comply with Ford's marking requirement as a condition to being included as a supplier for LT Metric tires for 1983.

Plaintiffs' Exhibit 9J.

Michelin contends that the documents were unduly prejudicial "character evidence" and had the effect of misleading the jury by allowing a failure to warn claim back into the case after it had been ruled out by the court. Accordingly, Michelin argues that any marginal relevance that the Ford correspondence may have had as to "notice" was greatly outweighed by the prejudicial effect of its admission and it should have been excluded. Fed.R.Evid. 403. Michelin argues that it acknowledged from the outset of this case that it was aware that there was a problem when its 16″ tires were mounted on 16.5″ rims and that personal injury or death could result.

The Ford correspondence was properly admitted. At the time it was admitted, the plaintiffs were relying not only on a theory of strict liability but also negligence and was seeking punitive damages.

Since the plaintiffs' negligence claim was extant at the time, the Ford correspondence was relevant to show what notice Michelin had with regard to the risk of harm posed when its 16″ tires were mounted on 16.5″ rims. Although Michelin insists that it has never disputed that it had such notice, there was no formal stipulation to that effect and the plaintiffs were entitled to prove it. The evidence was also relevant to show that it was foreseeable that tire mounters could mistakenly mount 16″ tires on 16.5″ rims. The evidence was also relevant on the question of punitive damages. The jury could have interpreted the correspondence as showing that Michelin was resistant to Ford's efforts to make the tires safer. In a letter dated February 8, 1982, a project engineer employed by Michelin stated that Michelin was concerned about starting a "dangerous legal precedent" with regard to the marking of the tires. Plaintiffs' Exhibit 9(d). The jury could have inferred from this something about the corporate attitude on the part of Michelin. Under Tennessee's prudent manufacturer's test, the focus is on the manufacturer's conduct in deciding to market the product considering the product's utility and the risks presented to consumers. Therefore, the reasonableness of the manufacturer's conduct is an issue in a case of this type. *Ray ex rel Holman v. BIC Corporation*, 925 S.W.2d at 533 n. 9. Plaintiffs argued in this case that Michelin was on notice since the mid–1970s that there was a problem when its 16″ tires were mounted on 16.5″ rims and yet it performed no burst tests, outside the area of defending litigation, to determine if a better, safer tire cord could have been utilized in constructing the tire in question. The Ford correspondence was relevant to help the jury decide what Michelin's corporate attitude may have been toward safety.

Michelin relies on the case of *Pridemark Custom Plating, Inc. v. Upjohn Company*, 702 S.W.2d 566 (Tenn.App.1985), for the proposition that the evidence was not admissible on the punitive damage claim. Michelin insists that the court held that to be admissible to support an award of punitive damages, the proffered evidence must show conduct of the defendant against the specific plaintiff. *See* 702 S.W.2d at 573. I agree with that. However, as I stated in my opinion as rendered from the bench, *Pridemark* is distinguishable. That was a case involving a lawsuit for property damage and business loss which was the result of a fire. It was not a personal injury case. A man had been killed in that fire but the lawsuit itself did not involve a wrongful death action. In the present case, Mr. and Mrs. Martin are clearly claiming that the conduct of Michelin in marketing a defective or unreasonably dangerous tire concerned acts against them which damaged them. Thus, *Pridemark* is inapposite. The Court gave a limiting instruction to the jury charging them that the Ford correspondence was not admitted for the purpose of showing that Michelin had failed to warn tire mounters with regard to the hazard because plaintiffs were not pursuing such a claim in this case. The evidence was properly admitted.

### IV. *The 1990 UMTRI Report*

■ Michelin argues that the undersigned erred in allowing Mr. Carlson to discuss and rely upon the 1990 UMTRI report on the following grounds:

Mr. Carlson should not have been permitted to discuss and rely upon the 1990 UMTRI report because the information in that report was unknown to [Michelin] at the time the case tire was manufactured; as a result of Mr. Carlson's testimony, the Michelin Cable bead was improperly measured against technological developments in bead design that were not "available" to [Michelin] and that [Michelin] could not have employed at the time this tire was manufactured.

Tennessee Products Liability law is clear that it is the state of scientific and

technological knowledge available to the manufacturer at the time the product is placed on the market, rather than at the time of injury, that is applicable in making a determination of whether a product was defective or unreasonably dangerous when it left the control of the manufacturer. Tenn.Code Anno. § 29–28–105(a) and (b).

I have already dealt with this issue extensively under Part II, above. As pointed out there, a plaintiff can establish a prima facie case of defect by proving the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiffs' harm. Restatement (Third) of Torts § 2(b); and cmt. f. The plaintiffs are not required to produce a prototype design in order to make out such a prima facie case. *Id.*

The plaintiffs proved that Goodyear had a single strand bead in its Wrangler tires in the mid–1980s. Those single strand beads were shown by plaintiff to have superior strength qualities when subjected to a mismatch situation. It was up to the jury to evaluate whether or not the plaintiffs' evidence demonstrated that there was a practical alternative design available at the time Michelin put the tire in question on the market. Michelin has never denied during the course of this trial that the single strand bead was technologically feasible at the time its tire was put on the market in January of 1990. Michelin argues that Goodyear had developed equipment for winding the single strand beads which was proprietary in nature and not available to Michelin as a practical matter. Again, this misses the point in the undersigned's opinion. The overriding question in a defective design case such as this one under the prudent manufacturer test is not what Michelin knew or should have known at the time it put the product on the market; rather, the overriding question is what could it have known as an expert in its field when it put the product into the stream of commerce. *See* Part II, above.

Michelin's reliance upon *Harwell v. American Medical Systems, Inc.,* 803 F.Supp. 1287 (M.D.Tenn.1992), is misplaced. *Ray ex rel. Holman v. BIC Corporation,* 925 S.W.2d 527 (Tenn.1996), was decided subsequently to the opinion in *Harwell.* The jury was entitled to consider the fact that there is no evidence that Michelin conducted any burst tests, outside the arena of litigation it was defending, to determine if the single strand bead was superior in a mismatch situation even though Michelin was well aware that single strand bead was technologically feasible well before the tire in question was put on the market.

Michelin had the ability to perform tests to determine the characteristics of its tires in mismatch situations in January of 1990 when this tire was placed on the market. Mr. Carlson had performed mismatch burst tests in 1979 or 1980 while working at MARC, Michelin's affiliate which designed and tested tires for it. Michelin had the ability to perform burst tests to determine the characteristics of its tires and the tires of other manufacturers. Thus, Michelin had the means and ability to perform tests similar to the UMTRI test if it had wished to do so. The single strand bead had been patented as early as the 1930s. Tr. 76, January 24, P.M. Session. The Restatement (Third) of Torts § 2(b);

> states that a design is defective if the product could have been made safer by the adoption of a reasonable alternative design. If such a design could have been practically adopted at the time of sale and if the omission of such a design rendered the product not reasonably safe, the plaintiff establishes defect under Subsection (b). . . . . . The defendant is thus allowed to introduce evidence with regard to industry practice that bears on whether an alternative design was practicable. Industry practice may also be relevant to whether the omission of an alternative design rendered the product not reasonably safe. While such evidence is admissible, it is not necessarily dispositive. If the plaintiff

produces expert testimony to establish that a reasonable alternative design could practically have been adopted, a trier of fact may conclude that the product was defective notwithstanding that such a design was not adopted by any manufacturer or even considered for commercial use, at the time of sale.

*Id.*, cmt. d. Even though there may not have been available to Michelin on the commercial market winding machines which would have produced the single strand bead such as that which was incorporated in the Goodyear Wrangler tire, this does not mean that the single strand bead was not "available" to Michelin when it placed the tire in question on the market. The plaintiff was not required to produce a prototype tire in order to make out a prima facie case. "[Q]ualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale." *Id.*, cmt. f. The Tennessee Products Liability Act makes it clear that consideration in a case such as this one is given to the customary designs, methods, standards, and techniques of manufacturing, inspecting and testing by other manufacturers of similar products. The fact that Goodyear had a single strand bead tire on the market in the mid–1980s goes a long way toward proving that a technologically feasible and practical alternative design was available to Michelin when it placed the subject tires on the market in the mid–1980s.

The 1990 UMTRI tests were admissible to prove that the foreseeable risks of harm posed by the Michelin tire could have been reduced or avoided by the adoption of a reasonable alternative design (the Goodyear Wrangler single strand bead radial tire) and the omission of the alternative design rendered the product not reasonably safe. Restatement (Third) of Torts § 2(b).

### V. *Paint on the Wheel*

■ Michelin argues that it is entitled to a new trial because it was denied the opportunity to impeach Mr. Martin's testimony that paint covered the size markings on the wheel at the time he mounted the tire and that the paint was later removed from the wheel rim after he turned it over to his counsel.

First of all, Michelin's cross-examination of Mr. Martin was never restricted. The plaintiffs' counsel certainly had no incentive to remove paint from the wheel after the fact as that would only make their case have less value. Mr. Carlson stated on cross-examination that he saw the size stamped on the wheel the first time he received the wheel and he was the first expert to examine it. Tr. at 133–134, January 25, P.M. Session. He did no destructive testing on the wheel; nor did he "clean it up." *Id.*

It appeared to the undersigned that Mr. Martin's testimony came as a surprise to counsel for both parties. He testified that the wheel was painted gray when he sent it to his lawyers and that the paint had subsequently been scraped off of the wheel. Tr. 24, January 26, A.M. Session.

Assuming the wheel had been unpainted at some time after it left the control of Mr. Martin, that would not amount to spoliation of evidence since the wheel that was shown to the jury had the 16.5″ marking clearly visible on it. Thus, any removal of paint from the wheel would have been detrimental to plaintiffs' case and would not have been prejudicial to the defendant. Mr. Martin suffered a serious head injury in this accident. His demeanor on the witness stand was observed by the jury. The court had to caution him about rambling in his testimony and it is quite possible that he was confused about this matter. In any event, plaintiffs' lawyers were prepared to testify that they had not altered the wheel in any way and Carlson confirmed that when he first got the wheel it was in the same condition as it appeared to the jury.

Plaintiffs' counsel did not seek to make any issue of the testimony about the "unpainting" of the wheel. In fact, plaintiffs' counsel invited the jury to apportion some degree of fault to Mr. Martin in reaching its verdict. The jury assessed 30% of the fault against Mr. Martin.

Even if the court had allowed a jury-out evidentiary hearing in which defense counsel were allowed to question plaintiffs' counsel about the alleged "unpainting" of the wheel, this would not have served any purpose. First of all, the condition of the wheel at trial was such that the jury could plainly see the markings on it. Secondly, the court could not have struck Mr. Martin's testimony since it was based on his best recollection of the condition of the wheel when he turned it over to his lawyers. The weight of that evidence was to be judged by the jury.

## VI. *Weight of the Evidence*

■ For the reasons indicated above, the undersigned is satisfied that the plaintiffs made out a prima facie case for the jury's consideration.

> Where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts.

*Duncan v. Duncan*, 377 F.2d 49, 54 (6th Cir.1967), *quoting Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 90 (3d Cir.)(*en banc*), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). If a reasonable person could have found in favor of the prevailing party, the verdict should not be overturned. *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1048 (6th Cir.1996).

■ The comparative fault of a plaintiff is a matter ordinarily left to the jury. *Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn.1997).

■ The plaintiffs' evidence demonstrated that Mr. Martin was an experienced tire mounter who followed certain rules of safety when mounting tires, including securing a tire with a chain while mounting it if he did not have a tire cage in which to place the tire during mounting. He testified that he would inspect the wheel to insure that there were no burrs on it, he would lubricate the tire, and use either a chain to secure the tire, a tire cage or a mounting machine to mount the tire. In this case, Martin testified that he used a tape measure to measure the wheel and then took it to a tire store and asked an employee to measure the wheel. He testified that the employee measured the wheel and "confirmed" that it was indeed a 16″ wheel as Mr. Martin thought. Tr. 31–32, January 26, A.M. Session.

Michelin introduced a considerable amount of evidence that Martin did not follow adequate safety procedures in mounting this tire. The conflicting testimony was for the jury to sort out. Michelin's own senior technical advisor and corporate representative at trial testified that tires are usually designed with a factor of safety of 4 to 1 or 5 to 1 and that this is in accordance with standards in the tire industry. Tr. 89–90, January 24, P.M. Session. The tire in question here had no factor of safety when mounted on a 16.5″ rim. The plaintiffs proved that it was foreseeable that tire mounters mistakenly mount 16″ tires on 16.5″ rims. Plaintiffs' proof showed that the tire in question will burst in a mismatch situation when inflated to the normal operating range of pressure. The jury could reasonably have concluded in this case that there was a technologically feasible and practical alternative design that would have reduced or prevented the plaintiffs' harm, *i.e.*, the single strand program bead. The jury could have concluded from the evidence that de-

spite Michelin's knowledge concerning this foreseeable misapplication of its product, Michelin never made it a priority to develop a stronger bead. *See e.g.,* Tr. 73–75, January 25, A.M. Session. A reasonable jury could have concluded from this evidence that had Michelin made it a priority to produce a 16″ light truck tire that would have withstood pressures in excess of normal operating pressures when mounted on a 16.5″ rim, it could have eliminated this hazard and prevented Mr. Martin's injury.

Since the verdict reached was a reasonable one under all the facts and circumstances, the motion for new trial will not be granted.

Order accordingly,