IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 8, 2003 Session

## GRETTA IRION v. SUN LIGHTING, INC., ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 98-C-354     Barbara N. Haynes, Judge**

_____

**No. M2002-00766-COA-R3-CV - Filed April 7, 2004**

_____

Consumer brought products liability suit under theories of negligence, strict liability in tort, and breach of implied warranty for property damage arising out of a fire caused when the consumer's son placed a pillow on top of a halogen torchiere lamp supplied by defendant Sun Lighting, Inc. and sold by defendant The Home Depot, Inc. The trial court granted summary judgment to both defendants and dismissed the lawsuit. The consumer appeals. Because we find the joint summary judgment motions were properly granted, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., J., and WILLIAM B. CAIN, J., joined.

David Zager, Scott Collins, Nashville, Tennessee, for the appellant, Gretta Irion.

J. Frank Thomas, Lynn T. Vo, Richard D. Moore, Nashville, Tennessee, for the appellees, Sun Lighting, Inc., and The Home Depot, Inc.

### OPINION

This lawsuit arises out of a fire which occurred on February 9, 1997, at the condominium of Gretta Irion and her family. Ms. Irion alleges that the fire was caused by a torchiere halogen lamp manufactured or imported and supplied by Sun Lighting, Inc. and purchased at The Home Depot in 1993. Ms. Irion sued Sun Lighting and The Home Depot,[1] alleging that the lamp was "defective"

_____

[1]Tenn. Code Ann. § 29-28-106(a) provides that no product liability action may be maintained against any seller when the product is received and sold by the seller in a sealed container, except for:

(continued...)

and "unreasonably dangerous" as defined by the Tennessee Products Liability Act ("TPLA"). Tenn. Code Ann. § 29-28-101 *et seq*. Specifically, Ms. Irion argued that the lamp was defectively designed because it did not have a protective guard over the bulb to prevent combustibles from contacting the bulb which generated extreme heat.

## I. THE FIRE

Ms. Irion purchased a torchiere halogen lamp at The Home Depot in early 1993 and used the lamp in her home without incident for the next four years. The floor lamp was approximately six feet tall with the halogen bulb located in the very top, within a bowl shaped enclosure. On February 9, 1997, Ms. Irion left her eight year old son, Tyler, and his two twelve year old twin friends, Brandy and Brandon, alone in the family condominium. Ms. Irion and her boyfriend, the twins' uncle, went out for approximately an hour to run errands and buy lunches for the children. During their absence, Tyler grabbed Brandy's Tweety Bird pillow[2] away from her and began playing "keep away." Tyler either climbed up on the living room sofa and placed the pillow on top of the torchiere halogen lamp

---

[1](...continued)
(1) Actions based upon a breach of warranty, express or implied, as defined by title 47, chapter 2 [Uniform Commercial Code]; or
(2) Actions where the manufacturer of the product or part in question shall not be subject to service of process in the state of Tennessee and where service cannot be secured by the long-arm statutes of Tennessee; or
(3) Actions where the manufacturer has been judicially declared insolvent.

Further, no action based on strict liability may be maintained against a seller unless the seller is also the manufacturer or the manufacturer is not subject to service of process in Tennessee or through the long-arm statutes or has been judicially declared insolvent. Tenn. Code Ann. § 29-28-106(b).

Although the record before us does not indicate that The Home Depot has moved for dismissal on the basis of the statute, it did plead "the sealed container doctrine" as an affirmative defense and has stated that it received the lamps in sealed boxes from the supplier and sold them still in the sealed box.

In its answer, Sun Lighting stated it was no longer in business, and was now "a defunct corporation in receivership by order of the Superior Court of California at Los Angeles County." In his deposition, Mr. Sun, who was the president of Sun Housewares d/b/a/ Sun Lighting throughout its existence, testified that the company had been placed in involuntary receivership in mid 1997. Mr. Sun also testified that Sun Lighting imported, rather than manufactured, all the halogen torchiere lamps it sold to retailers. There is nothing in the record before us to indicate Sun Lighting raised the issue that it was not a manufacturer. There is also nothing in the record to indicate that the solvency or amenability to service of process of the overseas manufacturers were raised.

Consequently, since neither defendant has raised the issues surrounding its status, and the record would preclude our determination of any such issues anyway, we presume those matters have been satisfactorily resolved or the attorneys have chosen not to raise them at this point.

[2]The descriptions of the size of the pillow ranged from 18 inches to 3 feet across. Ms. Irion had purchased the pillow for Brandy the day before.

or threw it in the air and it landed on the lamp.[3]  After some continued play in the living room, the boys went into the kitchen to play.  The boys heard Brandy say there was a fire and went to look.  By the time the children returned to the living room the pillow was in flames on top of the lamp, and the children ran out of the house.[4]

Fortunately, the children were not harmed.[5]  However, the condominum and contents suffered significant fire damage.[6]  By the time Ms. Irion returned home, the fire had been put out by the fire department and the children were at a neighbor's.  The fire report stated that the probable cause of the fire was "children playing."

## II. TRIAL COURT'S RULINGS

Plaintiff's amended complaint alleged as causes of action negligence and strict liability against both defendants and breach of implied warranty of merchantability and fitness only against The Home Depot.  In response to defendants' motion for partial summary judgment on the plaintiff's request for punitive damages, the plaintiff again sought to amend her complaint and filed two different proposed Second Amended Complaint(s).  The trial court granted the defendants' motion for partial summary judgment, dismissing the claim for punitive damages, and denied the plaintiff's motion to amend her complaint.  Ms. Irion appeals both these rulings.

Next, Ms. Irion filed a motion for summary judgment on the strict liability cause of action.  The defendants responded and also filed motions for summary judgment on negligence as well as

---

[3]Tyler testified that he was teasing Brandy, took the pillow away from her, and threw it over his shoulder.  He stated that he did not know where it landed, that Brandy did not say anything about it landing in the lamp, and that Brandon was in the kitchen at the time. Brandon, who was fourteen at the time of his deposition, testified that Tyler put the pillow on top of the lamp to hide it from Brandy and that Tyler had to climb on the arm of the sofa to reach the top of the lamp.  "Somehow we just forgot all about the pillow and started playing Nintendo.  And me and Tyler went to the kitchen and started playing with the fish.  And then I would say ten minutes later we see a flame."  Brandy testified that the boys had been teasing her by taking the pillow away from her and putting it various places.  She stated that Tyler took the pillow, climbed up on the arm of the sofa, and put the pillow on top of the lamp.  Because she had tired of the boys' teasing, she did not try to retrieve the pillow then, but instead played Nintendo.  She testified that the boys went into the kitchen to play with the fish and she stood in the doorway watching them.  When she looked back into the living room, the pillow was on fire in the top of the lamp.  She also stated some of the wall had also caught fire from parts of the burning pillow.  Brandon testified that when he first saw it, the pillow in the top of the lamp was the only thing on fire, and the fire was confined to the bowl on top of the lamp.

[4]During the children's depositions, they all agreed that an adult would probably have been able to put the fire out at the point they ran out of the house.

[5]Three family pet cats were lost in the fire.  Earlier in the litigation, Ms. Irion's claim for severe emotional distress over the loss of the cats, as well as distress caused by her concern for her son's distress over the fire, was dismissed by the trial court, Ms. Irion having withdrawn that claim, and it is not part of this appeal.

[6]The condominium was owned by Ms. Irion's father, and he received payment from his homeowners insurance.  Ms. Irion estimated her loss in personal property to be around $70,000 and, accordingly, she sought $70,000 in compensatory damages and $700,000 in punitive damages.

3

strict liability. The trial court granted the defendants' motions and dismissed the claims under negligence and strict liability theories. Ms. Irion appeals that ruling as well as the court's denial of her motion for summary judgment on strict liability.

In its order granting summary judgment to the defendants on strict liability and negligence, the trial court dismissed the lawsuit in its entirety, thereby also dismissing the only remaining cause of action, breach of implied warranty of merchantability and fitness. Ms. Irion appeals the trial court's dismissal of her breach of warranty claim asserting it was still viable even after dismissal of the other causes of action.

## III. STANDARD OF REVIEW

Summary judgments enable courts to resolve cases on dispositive legal issues. Summary judgment is appropriate when the filings supporting the motion show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Church v. Perales*, 39 S.W.3d 149, 156 (Tenn. Ct. App. 2000). But, summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion - that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Goodloe v. State*, 36 S.W.3d 62, 65 (Tenn. 2001); *Staples v. CBL & Associates*, 15 S.W.3d 83, 88 (Tenn. 2000).

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 284 (Tenn. 2001); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). This court's role in review of the grant of summary judgment is to review the record and determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *Staples*, 15 S.W.3d at 88; *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997).

When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact.

> To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. If the moving party fails to negate a claimed basis for the suit, the non-moving party's burden to produce evidence establishing the existence of a genuine issue for trial is not triggered and the motion for summary judgment must fail. If the moving party successfully negates a claimed basis for the action, the non-moving party may not simply rest upon the pleadings, but must offer proof to establish the existence of the essential elements of the claim.

4

*Staples*, 15 S.W.3d at 88-89 (citations omitted). Thus, once the moving party presents evidence sufficient to support a Rule 56 motion, the nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve a factual dispute at trial and is not entitled to a trial merely on the basis of allegations. *Celotex Corp. v. Catrett*, 106 S.Ct. 2548 (1986).

When reviewing the evidence, we, like the trial court, must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). Then, we must review the evidence presented at the summary judgment stage in the light most favorable to the nonmoving party, here Ms. Irion, afford all reasonable inferences to that party, and discard all countervailing evidence. *Bradshaw v. Daniel*, 854 S.W.2d 865, 870 (Tenn. 1993); *Byrd*, 847 S.W.2d at 210-11.

## IV. Product Liability

Although Ms. Irion has alleged various causes of action, her lawsuit is a product liability action governed by the Tennessee Product Liability Act of 1978, codified at Tenn. Code Ann. §§ 29-28-101 through -108:

> "Product liability action" for purposes of this chapter includes all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever.

Tenn. Code Ann. § 29-28-102(6).

To sustain any of her claims, Ms. Irion must meet the requirements of the Act that are a prerequisite to any finding of liability. In pertinent part, the Act provides that "[a] manufacturer or seller of a product shall not be liable for any injury to person or property caused by its product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105(a). Therefore, in order for Ms. Irion to prevail on any of her legal theories, she must first prove that the lamp was either in a "defective condition" or "unreasonably dangerous"at the time it left the control of the defendants. *Davis v. Komatsu America Industries Corp.*, 42 S.W.3d 34, 42 (Tenn. 2001); *King v. Danek Medical, Inc.*, 37 S.W. 3d 429, 435 (Tenn. Ct. App. 2000).

In addition, "[i]t is not enough to show that the product caused the plaintiff's injury or was involved in it. The plaintiff must show that there was something wrong with the product." *Tatum v. Cordis Corp.*, 758 F. Supp. 457, 461 (M.D. Tenn 1991). "It almost goes without saying that the identified product defect must be the proximate cause of the plaintiff's injury." *Id.; Pride v. BIC Corp.*, 218 F.3d 566, 580 (6th Cir. 2000). A plaintiff must show there was something wrong with the product and trace the alleged injury to the specific defect. *Danek Medical,* 37 S.W.3d at 435. The burden of proof as to all elements rests with the plaintiff.

Tenn. Code Annotated § 29-28-105(a) states that for liability to be imposed, the product must be determined to "be in a defective condition **or** unreasonably dangerous at the time it left the control of the manufacturer or seller." Thus, a plaintiff may succeed if he can establish either a defective condition or that the product was unreasonably dangerous. *Fulton v. Pfizer Hospital Products Group, Inc*., 872 S.W.2d 908, 911 n.1 (Tenn. Ct. App. 1994).[7]

The alternatives make little difference in the case before us because Ms. Irion claims that a design defect was the defective condition and also made the lamp unreasonably dangerous. She alleges the lamp was designed without a protective guard over the extremely hot halogen bulb to prevent combustibles from contacting the bulb, that the risks of fire were unreasonable, and that an alternative design could have eliminated or reduced the risks. She also asserts that any warnings accompanying the lamp were inadequate to warn her of the unapparent risk of fire, making the lamp unreasonably dangerous.

## A. DEFECTIVE CONDITION

A "defective condition" is defined as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2). The comments to Restatement (Second) of Torts § 402A provide in part:

> (*h*.) A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, as where too much salt is added to food, or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger (see Comment *j*.), and a product sold without such warning is in a defective condition.

---

[7]Under the Restatement (Second) of Torts liability attaches if the product is "in a defective condition unreasonably dangerous to the user or consumer or to his property." RESTATEMENT (SECOND) OF TORTS § 402A. The rule applies only where the defective condition makes the product unreasonably dangerous. *Id.* at cmt. *i.* The two requirements are not independent of each other and do not establish separate tests; both must be shown.

In interpreting and applying the definition of defective condition, courts have recognized that one factor to be considered is "consumer knowledge about the risks inherent in the use of (the) product." *Royson v. R.J. Reynolds Tobacco Co.*, 849 F.2d 230, 236 (6th Cir. 1988). "The 'every day experience' of the users of a product would give them expectations about the product." *Hughes v. Lumbermens Mutual Casualty Co, Inc.*, 2 S.W.3d 218, 226 (Tenn. Ct. App. 1999). In order to establish a defect in a product, the plaintiff must "trace the injury to some specific error in construction or design of the [product] . . . ." *Fulton*, 872 S.W.2d at 912 (quoting *Browder v. Pettigrew*, 541 S.W.2d 402, 404 (Tenn. 1976)).

The actual design of the product does not have to be perfect, accident proof, or incapable of causing injury to be considered non-defective. *See, e.g., Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1430 (E.D. Tenn. 1991) (holding "where it is simply shown that there is a better, safer, or different design which would have averted the injury, this does not establish that there has been a departure from the required standard of care"); *Fulton*, 872 S.W.2d at 912 (stating that a "manufacturer is not an insurer of a product that is accident proof, or incapable of causing injury"); *Bishop v. Smith & Nephew Richards, Inc.*, No. 02A01-9405-CV-00108, 1995 WL 99222, at *9 (Tenn. Ct. App. Mar. 10, 1995) (no Tenn. R. App. P. 11 application filed) (finding that a manufacturer is "not required to design a perfect or accident-proof product").

## B. UNREASONABLY DANGEROUS - TWO TESTS

A product is considered "unreasonably dangerous" if:

> [The] product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8).

As the statute indicates, Tennessee law recognizes two tests for determining whether a product was unreasonably dangerous: the consumer expectation test and the prudent manufacturer test. These two tests are not exclusive of one another, and either or both are applicable to cases where the product is alleged to be unreasonably dangerous. *Jackson v. General Motors Corp.*, 60 S.W.3d 800, 806 (Tenn. 2001).

> The statute provides two tests for determining whether a product is unreasonably dangerous. *Ray ex rel. Holman v. BIC Corp.*, 925 S.W.2d 527 (Tenn. 1996). Under the 'consumer expectation test,' a product is not unreasonably dangerous if the ordinary consumer would appreciate the condition of the product and the risk of injury. *Id.* at 530. The prudent manufacturer test 'imputes knowledge of the condition of the product to the manufacturer.' *Id.* 'The test is whether, given that

knowledge, a prudent manufacturer would market the product.' *Id.* These two tests are 'neither mutually exclusive nor mutually inclusive.' *Id.* at 531.

*Polar Tank*, 978 S.W.2d at 104.

The consumer expectation test involves the reasonable safety expectations of consumers and is applicable to those products about which the average consumer would have sufficient knowledge or familiarity to be able to form reasonable expectations of the product's safety. *Jackson*, 60 S.W.3d at 806. In contrast, the prudent manufacturer test is applicable to more complex products, or more complex operation or construction of a product, about which an average consumer would have no basis for forming any expectation. *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958 (M.D. Tenn. 2002). "For example, ordinary consumers would have a basis for expectation about the safety of a can opener or coffee pot, but, perhaps, not about the safety of a fuel-injection engine or an air bag." *BIC,* 925 S.W.2d at 531.

The consumer expectation test is applicable to any products liability action in Tennessee where the plaintiff seeks to establish that a product is unreasonably dangerous. *Jackson*, 60 S.W.3d at 805. Nonetheless, there may be situations where the consumer expectation test is not adequate. *BIC*, 925 S.W.2d at 531, because, in order to be successful under the consumer expectation test, the plaintiff must prove that the ordinary consumer has an expectation regarding the safety of the product. *Jackson*, 60 S.W.3d at 804. "Therefore, although *Jackson* stands for the proposition that the consumer expectation test is theoretically applicable to all situations, even that Court acknowledged that ordinary consumers would have no expectations regarding certain products and certain failures." *Coffey*, 187 F. Supp.2d at 969.

Regardless of the test employed, the burden remains with the plaintiff to establish injury as a result of the unreasonably dangerous product. *BIC*, 925 S.W. 2d at 533. Ms. Irion relies on both tests.

## 1. CONSUMER EXPECTATION TEST

As stated above, in order to be successful under the consumer expectation test, the plaintiff must present evidence that the ordinary consumer has an expectation regarding the safety of the product.

Whether a plaintiff is successful on a products liability claim under the consumer expectation test will depend on whether the trier of fact agrees that the plaintiff's expectation of product performance constituted the reasonable expectation of the ordinary consumer having ordinary knowledge of the product's characteristics.

*Jackson*, 60 S.W.3d at 804.

8

The consumer expectation test derives from the Restatement (Second) of Torts, § 402A. *BIC*, 925 S.W. 2d at 530. Liability under that section may exist if the product is "in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." *Id.* at cmt. *g.* Comment *i* to § 402A states in pertinent part:

> The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fuel oil, is unreasonably dangerous.

A plaintiff using the consumer expectation test must produce evidence of the "objective conditions of the product as to which the jury is to employ its own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." *Jackson*, 60 S.W.3d at 805-06. This entails showing that prolonged use, knowledge, or familiarity of the product's performance is sufficient to allow an ordinary consumer to form a reasonable expectation of the product's safety. *Id.*

> In sum, "[i]f the product is more dangerous than a reasonable consumer would have expected, it is defective." Under this test, a product is not unreasonably defective if the ordinary consumer would appreciate the condition of the product and the risk of injury. Hence, summary judgment is proper if the undisputed evidence demonstrates that "the danger is obvious to the ordinary consumer."

*Coffey*, 187 F. Supp.2d at 968 (citations omitted).

The consumer expectation test is often viewed as more protective of plaintiff consumers, but "courts have used the consumer expectations test most often to deny recovery to plaintiffs in cases involving obvious design hazards." DAVID G. OWEN, M. STUART MADDEN, & MARY J. DAVIS, MADDEN & OWEN ON PRODUCTS LIABILITY §8.3 at 445-46 (3d ed. 2000).

> The utility of the consumer expectations test is severely compromised when design dangers are obvious. Because consumers acquire their safety and danger expectations most directly from a product's appearance, obvious dangers - such as the risk to human limbs from an unguarded power mower or industrial machine - are virtually always contemplated or expected by the user or consumer who thereby is necessarily unprotected by the consumer expectations test, no matter how probable or severe the likely danger nor how easy or cheap the means of avoiding it.

*Id.* at 447.

9

## 2. THE PRUDENT MANUFACTURER TEST

In contrast, the prudent manufacturer test imputes knowledge of the condition of the product to the manufacturer. *Coffey*, F.Supp.2d at 268; David J. Marchitelli, Annotation, *Products Liability: Prudent Manufacturer Test*, 86 A.L.R. 5TH 215 (2001). The prudent manufacturer test turns on whether, balancing all the relevant factors, a reasonably prudent manufacturer would market the product if it had knowledge of the dangerous condition. *Davis v. Komatsu Am. Indus. Corp.*, 46 F. Supp.2d 745 (W.D. Tenn. 1999). The prudent manufacturer test requires a balancing of factors:

> As expanded by Dean Wade, the test has evolved into a consideration of various factors which must be weighed to determine whether the manufacturer was reasonably prudent. The factors include the usefulness and desirability of the product, the safety aspects of the product, the availability of a substitute product which would meet the same need, the manufacturer's ability to eliminate the unsafe character, the user's ability to avoid danger, the user's awareness of the danger, and the feasibility of spreading the loss.

*BIC,* 925 S.W.2d at 532-533.

The two tests vary with regard to the type of proof required. Expert testimony is required under the prudent manufacturer test.

## C. OTHER STATUTORY LIMITATIONS

Ms. Irion's claims and the evidence she offered to support them must also be considered in light of another statutory provision that applies to claims that a product was defective or unreasonably dangerous. It is found at Tennessee Code Annotated § 29-28-105(b) and states:

> In making the determination of whether a product is defective or unreasonably dangerous, the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.

This provision comes into play in the case before us because Ms. Irion's proof consists largely of post-sale information, remedial measures, and warnings released or undertaken by an industry safety organization and a governmental commission.

10

## V. PROOF

Ms. Irion argues that summary judgment was inappropriate because there are disputes of fact that are material to the question of whether the lamp was unreasonably dangerous when it was sold. Our review of the record, however, does not lead us to conclude that many facts are in dispute; rather, it is a question of application of those facts to the legal standards set out above.

Much of the proof offered by the parties involves information from Underwriters Laboratories and the Consumer Product Safety Commission. Thus, to understand the relevance and significance of that information, some description of the two entities is necessary. Underwriters Laboratories ("UL") is an independent, not-for-profit safety certification organization that has been testing products for public safety for more than a century.

All parties agree that UL is the premier organization in the United States for setting safety standards for electrical products. UL establishes safety standards for product types; tests specific products to those standards; and inspects facilities that manufacture those products to ensure continued compliance with the standards. When UL determines that a product meets the required safety standards, it will issue a listing for that product, which includes a unique file number. The product may then carry the UL logo identifying it as a product that has been tested and approved by UL. UL also determines whether warnings should be placed on a product, specifies the wording of the warnings, and specifies their placement.

The Consumer Product Safety Commission ("CPSC") is an independent federal regulatory agency created "to protect the public against unreasonable risks of injuries and deaths associated with consumer products." Both these entities have dealt with issues regarding halogen torchiere lamps, as will be explained later.

Mr. Daniel Sun testified that he had been president of Sun Housewares, Inc.[8] from its beginnings until it was involuntarily placed in receivership in mid 1997, approximately 17 years. The company sold torchiere halogen lamps to the Home Depot in 1991 and afterward, as did other major vendors. All of the halogen lamps Sun sold were imported, as were almost all halogen lamps at that time. He testified that there were about fifty manufacturers overseas that produced almost identical halogen torchiere lamps. Mr. Sun testified that halogen torchiere lamps were first designed in Europe, where they were widely used before they became popular in the United States. The halogen lamps he sold were manufactured in Taiwan and China.

Mr. Sun testified that the company was required to comply with the procedures, standards and other requirements of UL. UL provided safety specifications for products, and UL would occasionally modify those specifications and notify manufacturers of those changes. UL inspectors would visit his manufacturing facility monthly. For imported products, UL inspectors inspected the overseas facilities that manufactured the lamps. If the product did not pass the UL tests, it could not

---

[8]He explained that Sun Housewares also used the d/b/a name Sun Lighting, Inc.

be shipped. In addition, UL provided the specific wording for any warning or precaution label that was required to be affixed to any product with the UL symbol on the label.

Mr. Sun testified that his company relied on UL to provide guidance about any safety modifications that were needed with regard to a product, as did other manufacturers and suppliers. He unequivocally stated that Sun Housewares made any changes required by UL. He testified that the last change he was aware of in UL's specifications for halogen torchiere lamps was in the last few months before his company went into receivership and he was no longer involved with it. He was aware that UL had also previously changed the maximum wattage of the halogen bulb that could be used in such lamps from 500 watts to 300 watts and may have made a change in the "tilt test" results, but could not remember the exact timing of those changes. About the time Mr. Sun lost his business to receivership, he was notified by UL that it was considering requiring a flame test. In preparation for the anticipated change, Mr. Sun and his quality assurance manager performed some of those tests. This would have been in early 1997.

He was never told by a government official, a Home Depot official, UL, or anyone else to institute any recalls of lamps he had sold. Mr. Sun unequivocally testified that every product he sold complied with the applicable UL specifications and requirements and every lamp had a UL sticker on it.

Similarly, there is no dispute that The Home Depot has always required that any electrical product sold in its stores be listed as a UL approved product and bear the UL logo and listing mark. Mr. Mike Scott, who worked in the quality assurance department of The Home Depot since 1995, testified that The Home Depot relied on UL to set safety standards and to ensure a product's compliance with those standards. He was aware that UL had revised safety standards for halogen torchiere lamps. Originally, UL had considered 500 watt bulbs safe for such lamps, but in April of 1996 lowered the maximum recommended wattage to 300 watts.

Mr. Scott was also aware that in August of 1997, the Consumer Product Safety Commission announced a recall for in-home consumer repair of halogen torchiere lamps. The halogen lamp industry made wire guards for previously-purchased lamps free to consumers and established an 800 number for people to call to get the guards. The Home Depot participated in this effort by posting warning notices in its stores, posting information about the 800 number, and by stocking 50,000 of the wire guards to give to consumers in their stores.[9] He was also aware that later UL published revised safety standards for the manufacture of halogen torchiere requiring measures, such as affixing a guard, to limit the proximity of the bulb to combustible materials.

_____

[9]Apparently in an effort to support her dismissed claims for punitive damages, Ms. Irion criticizes The Home Depot's efforts regarding distribution of the wire guards and notification to past customers as part of the August 1997 CPSC notice. However, we fail to see how the August 1997 industry and CPSC supported efforts to distribute wire guards is at all relevant to the fire that happened in February 1997. Ms. Irion certainly cannot claim that she attempted to get a wire guard but the Home Depot ran out.

Ms. Irion offered no proof that at the time the lamp at issue left the manufacturer or was sold to her it did not comply with industry safety standards as promulgated by Underwriters Laboratories. She offered no proof that any other manufacturer of millions of halogen torchiere lamps sold in the United States included a guard over the bulb at the time of her purchase.

Instead, Ms. Irion rests her claims primarily on information developed well after the manufacture of the lamp she purchased. This information was presented in the form of notices or press releases about halogen torchiere lamps. Because any objection to consideration of these materials on the basis of the requirements of Rule 56 has been waived and, in fact, all the parties have relied upon and cited to these various documents, we will not attempt to discern from the record before us whether they were properly authenticated or introduced into the record.[10]

On August 21, 1997 the CPSC issued a release stating that it was aware of at least 189 fires and 11 deaths since 1992 involving halogen torchiere floor lamps; that these lamps first became available in the United States in 1983; that sales had grown significantly in the 1990s; and there were some 40 million such lamps in homes at that time. Among other things, the release succinctly recounted the history of evolving standards for halogen torchiere lamps:

> In 1996, CPSC initiated an assessment of the current UL safety standard for portable lamps, including lamps equipped with tubular halogen bulbs. Tests carried out as part of this assessment showed that tubular halogen bulbs of 250 watts, 300 watts, and 500 watts installed in torchiere lamps could start a fire if they come in contact with flammable materials. In July 1996, CPSC announced its findings and issued a warning to consumers about the potential fire hazard associated with using torchiere floor lamps illuminated by tubular halogen bulbs. In the same month, CPSC urged UL to toughen its performance standard for portable lamps. In February 1997, UL adopted a revised performance standard for halogen torchiere floor lamps.

This history is reflected in other documents submitted in the case before us. In April of 1996, UL issued a release urging consumers with 500-watt halogen torchiere (floor-standing) lamps to replace their 500-watt halogen bulbs with 300-watt bulbs. The release stated, "If misused by placement too close to combustible materials, 500-watt halogen bulbs could ignite materials such as drapery and other fabrics," and, even with the 300-watt bulb, "[a]s with any lamp, combustible materials should never be placed on or near the lamp 'dish' or shade."

---

[10]Although these documents are included in the technical record transmitted to us, it is not entirely clear that all of them are properly in the record that can be considered in ruling on a motion for summary judgment. *See* Tenn. R. Civ. P. 56; *Byrd*, 847 S.W.2d at 215; *Summers v. Cherokee Children & Family Services*, 112 S.W.3d 486, 510 (Tenn. Ct. App. 2002). However, objections are waived if not timely made. *Cherokee*, 112 S.W.3d at 510; *Danek Medical*, 37 S.W.3d at 441 (holding that although the court should generally refuse to consider unauthenticated documents in ruling on a motion for summary judgment, a failure to timely object can constitute a waiver, and since the defendants did not ask to have the documents stricken on appeal, the court did not attempt to determine whether a waiver occurred). Ms. Irion did file certified copies of the CPSC documents.

13

The release also stated that UL was currently proposing revisions to part of its test standard applicable to the lamps and as of May 2, 1996, UL would require manufacturers to produce only 300-watt or less halogen torchiere lamps. Other revisions would possibly be proposed "based on further investigation of safety issues that arise in the field." The UL release gave safety tips "to help reduce the risk of fire that could result from placing the product too close to combustible materials -- such as drapery and other fabrics . . ."

A CPCS release dated July 29, 1996 warned consumers that "the tubular light bulbs in most torchiere-style halogen lamps can reach very high temperatures and could start a fire if they come in contact with curtains, clothes, or other flammable material." The notice stated that approximately 35 million to 40 million torchiere lamps with tubular halogen bulbs were then owned by consumers in the United States. The notice was intended to make sure consumers were aware that the high wattage halogen tubular bulbs used in the torchieres could reach temperatures much higher than the lower wattage incandescent bulbs often used in other lighting and therefore "have to be treated with greater care." The CPSC notice offered the following tips for safer use of halogen torchiere lamps:

Never allow torchiere halogen lamps to be placed where the tubular bulb could come in contact with curtains or other cloth window treatments;
Never leave a torchiere halogen lamp on when you leave the room or are not at home;
Never drape clothes over a torchiere halogen lamp;
Keep halogen torchiere lamps away from elevated beds like bunk beds where bedding may get too close to the tubular bulb.

As referred to by Mr. Scott, Underwriters Laboratories revised its standards relating to halogen torchiere lamps, and made those changed standards applicable to lamps manufactured after February 5, 1997. The revisions required additional warning markings to be located on the pole, base, or power-supply cord of the unit warning that, to avoid the risk of fire, the lamp should not come in contact with combustible materials. This warning label was in addition to the warnings on the box and in the lampshade.

UL also announced in this February 6, 1997 release that in order to earn the UL Listing Mark, halogen lamps would be required to pass a test in which a double layer of cheesecloth, draped over the top of the lamp for a duration of seven hours, does not ignite or develop a hole. The release stated that manufacturers had developed "new design features for UL listed halogen torchiere lamps to keep combustible material away from the bulb area." Allowable features included glass shields, wire guards and heat-sensitive switches. The UL release stated, "UL Listed halogen torchiere lamps that meet the original requirements of the Standard may still be used effectively, when used in accordance with manufacturer's use and care instructions" and listed a toll-free number and web site for information on halogen torchiere lamp safety.

On August 21, 1997, the CPSC announced through news releases[11] that it and the halogen lamp industry were cooperatively recalling for in-home consumer repair some 40 million torchiere floor lamps. As part of this effort, the industry was making available free wire guards through a number of retail stores, including The Home Depot. In addition, consumers could get the wire guards by calling an 800 number.

The release stated that installing the wire guard would "reduce the potential fire hazard by making it harder for flammable materials to touch the lamp's halogen bulb." It referenced the revised UL standard for such lamps manufactured after February 5, 1997, as offering an improved level of safety and noted that lamps complying with that standard would already have a glass or wire guard over the bulb. The release also reminded consumers that the guard would only be effective if halogen bulbs of 300 watts or less were used. The bulletin also stated, "[a]lthough the use of the wire guard with a 300-watt bulb will reduce the potential fire hazard, it is important for consumers to understand that these lamps still must be treated with care." The following safety tips for halogen torchiere floor lamps were once again given:

Never place the lamp near curtains or other cloth window treatments.
Never drape clothes over the lamp.
Keep the lamp away from bedding.
Never leave the lamp on when you leave a room or are not at home.
To reduce the likelihood of tipover, keep children and pets away from the lamp.
Only use a halogen bulb of 300 watts or less in the lamp.

In addition to the documents from CPSC and UL, Ms. Irion provided an affidavit from her proposed expert, Herbert Stewart, a physicist who worked for over twenty years in research and product development at Aladdin Industries and had experience with consumer product testing. Mr. Stewart opined that the lamp was unreasonably dangerous when it was sold to Ms. Irion in 1993. It is not clear on what basis he came to this conclusion, except for two other opinions he reached. The first was that the average consumer was unaware that halogen bulbs reach temperatures much greater than incandescent bulbs, was unaware of the ignition point of average household materials, and, consequently, did not know of the dangers posed by halogen bulbs. The second was that a prudent manufacturer would have understood that "in order to be brighter the bulb would be hotter" and would have independently tested the product for safety.[12]

---

[11]The August 21, 1997, bulletin to the public was titled "CPSC and Industry Announce Corrective Action to Improve Safety of Halogen Torchiere Floor Lamps."

[12]The remainder of Mr. Stewart's affidavit attempted to apply the prudent manufacturer test to alleged post-sale duties. He opined that a prudent manufacturer would have retested the product upon "learning about accidents and fires in 1992," apparently referring to CPSC statements that it had received reports of incidents occurring since 1992, but without proof that Sun or Home Depot learned of them that early. He also opined that "when a prudent manufacturer learned of fires such facts would require a manufacturer to give the product immediate consideration for engineering safety features to retrofit and/or recall and to protect its prior sale customers."

15

# VI. ANALYSIS

Summary judgment is appropriate in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge*, 952 S.W.2d at 410; *Byrd*, 847 S.W.2d at 210; *Rains v. Bend of the River*, 124 S.W.3d 580, 587 (Tenn. Ct. App. 2003). Where the moving party satisfactorily challenges the nonmoving party's ability to prove an essential element of its claim, the nonmoving party has the burden of pointing out, rehabilitating, or providing new evidence to create a factual dispute as to that element, and cannot rely on mere conclusory allegations. *Staples*, 15 S.W.3d at 88-89; *Rains*, 124 S.W.3d at 587-88. A nonmoving party who fails to carry that burden faces summary dismissal of the challenged claim. The question in such cases is whether sufficient evidence has been presented that creates a material issue of fact that should be presented to the jury.

Summary judgment may be used to resolve outcome determinative issues. Even where the determinative issue is ordinarily a question of fact for the jury, such as causation, summary judgment is still appropriate if the evidence is uncontroverted and the facts and inferences to be drawn therefrom make it clear that reasonable persons must agree on the proper outcome or draw only one conclusion. *White v. Lawrence,* 975 S.W.2d 525, 529-30 (Tenn. 1998); *McClung v. Delta Square Limited Partnership*, 937 S.W.2d 891, 905 (Tenn. 1996); *Rains*, 124 S.W.3d at 588.

Thus, although the general rule is that "the issue of whether a product is defective or unreasonably dangerous is one for the jury," *Whaley v. Rheem Manufacturing Co.*, 900 S.W.2d 296, 300 (Tenn. Ct. App. 1995), quoting *Curtis*, 778 F. Supp. at 1427, summary judgment for defendants is proper in a products liability case where the plaintiff fails to respond to a properly supported motion with proof that creates a genuine issue of fact as to whether the product was unreasonably dangerous or in a defective condition. *Danek Medical*, 37 S.W.3d at 444, 452. "The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Curtis*, 778 F. Supp. at 1424.

In the case before us, the evidence establishes that the lamp in question was manufactured in compliance with UL safety standards in effect at the time of manufacture. It was manufactured in accordance with industry standards and practices, and its design did not in any material way deviate from that used by other manufacturers of the millions of such lamps sold in the United States. These lamps generally followed the same design with an open bowl or shade at the top of a tall pole with the halogen bulb located inside the bowl. It was the general custom for manufacturers and sellers to rely on UL for testing, inspecting and setting safety standards. In determining whether a product was defective or unreasonably dangerous, the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products at the time of manufacture or sale must be considered. Tenn. Code Ann. § 29-28-105(b).

Ms. Irion has offered no proof to contradict the evidence that the lamp in question was manufactured in accordance with industry safety standards in effect at the time and conformed in

16

design to millions of others manufactured and sold in 1992 and 1993. She has offered no proof that any other manufacturer's design incorporated the wire guard or other device she claims should have been on the lamp she bought. She has offered no proof that reliance on UL standards was not industry practice.

Instead, she would rely on post-sale actions and statements from UL and the CPSC, as described earlier. Defendants object to Ms. Irion's proof regarding the post-sale UL and CPSC reports as being inadmissible, relying on Tenn. Code Ann. § 29-28-105(b), quoted earlier, which provides that the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is what is applicable to the question of whether a product is unreasonably dangerous. We think that whether or not the use of a wire guard to keep combustibles from coming into contact with the bare bulb is "scientific or technological knowledge" that was unavailable to manufacturers in 1993 is subject to question. The defendants have not provided any proof that it was not available. There is no proof, however, that any manufacturer employed a design incorporating such a guard in 1992 or 1993.

The philosophy behind Tennessee's statutory prohibition on using post-sale developments to prove that a product was unreasonably dangerous when it was sold is similar to that underlying the almost universal rule of evidence that precludes the introduction of evidence of remedial measures taken after the event at issue in a lawsuit for certain purposes. *See* Tenn. R. Evid. 407.[13] As the Advisory Commission Comments to Rule 407 state, "[m]anufacturers should be encouraged to improve product designs without fear of encountering damaging evidence." Or, "[s]tated simply, if manufacturers knew that making safer products would expose them to liability for products already sold, they would have no incentive to improve their products. Tort law should not operate to discourage the development of safer products." Douglas R. Richmond, *Expanding Products Liability: Manufacturers' Post-Sale Duties to Warn, Retrofit and Recall*, 36 IDAHO L.REV. 7, 23 (1999).

Tenn. R. Evid. 407 rule does not directly apply here since most of the remedial measures were undertaken by the industry and UL and occurred before, even if days before, Ms. Irion's fire. The 1997 requirement for mechanisms to keep combustible materials away from the bulb was,

---

[13]     When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent remedial measures is not admissible to prove strict liability, negligence, or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving controverted ownership, control, or feasibility of precautionary measures, or impeachment.

Tenn. R. Evid. 407. As used in Rule 407, "'[r]emedial' action contemplates changing a situation, usually an unsafe property or product, to prevent the situation from causing further injury." *Rothstein v. Orange Grove Center, Inc.*, 60 S.W.3d 807, 813 (Tenn. 2001).

however, an industry reaction to fires reported in and after 1992. The recall for installation of wire guards occurred after the Irion fire, but was not a direct result of that fire.[14]

The trial court did not make any ruling about the admissibility of Ms. Irion's evidence in light of Tenn. Code Ann. § 29-28-105(b) or state what evidence it was relying on. We need not resolve those issues because, even if we were to assume that such evidence would be admissible at trial, our review of the documents at issue compels the conclusion that they simply do not prove that the lamp was unreasonably dangerous or in a defective condition when it was manufactured.

UL changed its standard in 1997 to require protective measures to to reduce the possibility of fire caused by combustible materials coming into contact with the bulb. However, even when UL changed the standard in February of 1997, four days before the fire in Ms. Irion's condo, UL stated that continued use of lamps meeting the prior standard, as did the lamp at issue, was not unsafe if manufacturers' instructions were followed.

Fires reported as early as 1992 led the CPSC and the UL to take action or issue notices regarding halogen torchiere lamps in an attempt to "improve safety," not to remove an unreasonably dangerous product from the market. The notices also were intended to increase consumer awareness of the appropriate use of the lamps, an interpretation that is consistent with the defendants' characterization of many of the fires as resulting from consumer misuse. Nowhere in the materials presented by Ms. Irion do UL or CPSC claim that the lamp is unsafe if it is used in accordance with precautions appearing on the products and with the CPSC's own safety tips. There was no recall of all lamps manufactured before 1997, and the CPSC did not warn the public to discontinue use of them.

Thus, the post-sale UL and CPSC notices do not prove that the lamp was unreasonably dangerous or in a defective condition at the time it left the control of the defendants. Simply because a wire guard or other device was incorporated into the design of such lamps four years after Ms. Irion purchased her lamp, it does not necessarily follow that the absence of such guard made the product unreasonably dangerous or defective. The law does not require that a product be designed so that it is accident-proof or incapable of causing injury. A manufacturer is not required to incorporate the ultimate safety features into a product. *Curtis*, 778 F. Supp. at 1430. Thus, it is not enough for Ms. Irion to show that a better, safer, or differently designed lamp would have prevented the fire; she must actually show that the product was unsafe for normal or anticipatable handling at the time she purchased the lamp in 1993. The proof she offered in terms of post-sale announcements by UL and the CPSC, by the language of those announcements, does not establish the required element.

---

[14]Even if Rule 407 were applicable to prevent Ms. Irion from introducing evidence of the changed UL standards in order to show that the lamp was unreasonably dangerous at the time she purchased it, the evidence could still be admitted to show that an alternative design was feasible, if that issue were controverted by the defendants. Advisory Commission Comments.

18

In *Curtis*, a two year old child suffered injury when his diaper was set on fire by his three and a half year old brother when the two children were left unattended in a car where a disposable cigarette lighter had been left. 778 F. Supp.1421. The plaintiffs alleged that the lighter was defective and unreasonably dangerous because it was not designed to be childproof or child resistant. The court held that the plaintiffs offered no proof that the cigarette lighter in question deviated from other lighters on the market or that other lighters had child-proof safety features. This failure of proof, along with the court's finding that the product at issue performed in the manner expected considering its nature and intended function, led the court to conclude that the plaintiffs had failed to establish a genuine issue of fact to go to a jury and granted summary judgment for defendants. *See also Silver v. National Presto Industries, Inc*., No. 88-6305, slip. op. (6th Cir. Sept. 15, 1989) (holding that proof that it was technically feasible to design a lockable lid for a portable deep fryer did not render the fryer defective or unreasonably dangerous, there was no proof that any other fryers on the market at the time had locking lids, and affirming trial court's grant of directed verdict to defendant).

According to the relevant statutes, a product is not in a defective condition when it is safe for normal or anticipatable handling and consumption. Tenn. Code Ann. § 29-28-102(2). A product is unreasonably dangerous only if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Tenn. Code Ann. § 29-28-102(8). Similarly, under the consumer expectation test, a product is not unreasonably dangerous if a reasonable consumer would appreciate the condition of the product and the risk of injury, *i.e*., if the danger is obvious to the ordinary consumer. *Coffey*, 187 F. Supp.2d at 968. The test is "whether the product's condition poses a danger beyond that expected by an ordinary consumer with reasonable knowledge." *BIC,* 925 S.W.2d at 529. Consumer knowledge about the risks inherent in the use of a product is a relevant consideration.

In *BIC,* a four year old child was left alone while his mother walked her older child to the bus stop. A cigarette lighter had been left in the apartment by a friend of the mother. When the mother returned, her apartment building was ablaze. She eventually filed suit against the manufacturer of a cigarette lighter alleging that the lighter was the source of the fire and was an unreasonably dangerous product because it was not child-resistant. Our Supreme Court held that the defendant would unquestionably be entitled to summary judgment under the consumer expectation test, stating, "[a]n ordinary consumer would expect that a cigarette lighter, left in the hands of a young child, could cause danger and injury concomitant to that occurring in this case."

The same reasoning applies here. It was obvious that the lamp had an open bowl at the top and the halogen light bulb was exposed within that bowl. An ordinary consumer could expect that an article placed in the bowl would come into contact with the bulb. An ordinary consumer could expect that a combustible article placed on top of the bulb would catch fire. The CPSC advised the public of the dangers of fabric and other combustible material contacting a hot bulb. We think an ordinary consumer with reasonable knowledge could expect that the combination of children left

19

unattended and the torchiere lamp apparently left on[15] could result in the type of injury occurring in the case before us.

The only proof Ms. Irion offered regarding a consumer's expectation was her own statement that she had no idea how dangerous the lamp was until the fire and the lawsuit.[16] She also testified, however, that she had previously told her son not to put things, including a pillow, on any lamp because "it could cause a fire." The lamp performed without incident and in accordance with its purpose and any expectations of its purchaser for four years. The fire herein was not the result of ordinary or anticipatable use; the lamp did not malfunction and spontaneously ignite. Ms. Irion used the lamp in her home for approximately four years without incident until her 8 year old son, while without adult supervision, placed an overstuffed pillow on top of the lamp.

In addition to failing to meet the consumer expectation test, Ms. Irion's evidence does not create a material issue of fact regarding the prudent manufacturer test. Conspicuously absent from the record is any proof that the defendants failed to meet the industry safety standards in place at the time the lamp was placed into the stream of commerce. Ms. Irion submitted no proof that the lamp deviated from other similar lamps that were on the market at the same time. Besides the failure to present evidence that the wire screens she champions were developed, available or used at the time she purchased her lamp in 1993, she has failed to offer any probative evidence regarding the other factors to be considered, such as foreseeable costs and benefits in view of the risk. In fact, Ms. Irion has failed to prove there was a risk if proper precautions had been followed.

The trial court properly granted the defendants' motions for summary judgment since Ms. Irion failed to prove a genuine issue of material fact exists concerning whether the lamp was defective or unreasonably dangerous at the time it left the control of the defendants. As a consequence, Ms. Irion's claims of negligence, strict liability, failure to warn, or implied warranty claims must fail. Tenn. Code Ann. § 29-28-1059(a); *see* also, *Benson v. Tennessee Valley Electric Coop.*, 868 S.W.2d 630, 635 (Tenn. Ct. App. 1993)(quoting *Browder,* 541 S.W.2d at 404).

---

[15]Ms. Irion had no specific recollection of turning the lamp on or off before leaving. Brandon testified that he thought the lamp had been on most of the morning because they generally turned it on when they got up in the morning since that was the only lamp used in that part of the house. Tyler also testified that the lamp was on.

[16]Ms. Irion's expert, Mr. Stewart, claimed to have expertise in consumer expectation, but his only opinions on that subject were that the average lay consumer did not know of the dangers posed by the extreme heat generated by a halogen bulb, was unaware of the ignition point of household fabrics, that such ignition point is below the temperatures of halogen bulbs, and was not aware of the 189 reported household fires involving halogen torchiere lamps. None of these statements is directed to the average consumer's knowledge that the design of the lamp allowed items placed in the shade to come into contact with the bulb. We find the opinions not relevant to the issue of reasonable consumer expectation.

## VII. RELATED CLAIMS

One of the assertions made by Ms. Irion in support of her claim the lamp was defective or unreasonably dangerous is that Sun Lighting and The Home Depot were negligent in failing to perform independent testing on the lamp before putting it on the market. Essentially, she asserts they could not rely on UL to set safety standards and test products to those standards. We find no basis for this alleged duty to independently test in Tennessee law. Under the Tennessee Product Liability Act the test is whether the product was defective or unreasonably dangerous. The Act specifically incorporates industry standards for testing, or those used by other manufacturers. Ms. Irion has produced no proof that such reliance on UL was unwarranted or that any other manufacturers conducted safety tests independently of UL.

Much of Ms. Irion's criticism of the defendants herein relate to actions she alleges they should have taken after the manufacture and sale of the lamp herein. For example, she asserts that Sun Lighting and The Home Depot should have done independent testing of halogen torchiere lamps some time after she purchased her lamp and before the 1997 UL revision of safety standards. Again, she apparently asserts that their reliance upon Underwriters Laboratories to set and modify safety standards was somehow a breach of a duty. Again, we find no basis in Tennessee law for the imposition of a duty to perform post-sale independent testing. It is not clear what Sun Lighting could have done with regard to the lamp she had already purchased based upon any results from the post-sale tests. To the extent she also claims there was a post-sale duty to warn, we note that, like the majority of states, Tennessee does not recognize a post-sale duty to warn.[17] Richmond, *supra*, 36 IDAHO L. REV. at 21. Although the Restatement (Third) of Torts adopts some post-sale duties, Tennessee had not adopted those provisions and, in any event, Ms. Irion's proof would not trigger those duties.[18]

---

[17]It is not clear how Ms. Irion would have Sun or The Home Depot contact the potentially millions of purchasers. It is also not clear exactly what these post-sale warnings would have stated that was not contained in the original warnings. She does not address the effect or impact on her argument of the CPSC and UL warnings.

[18] Section 10 of the Restatement (Third), Torts: Products Liability provides:

(a) One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons or property caused by the seller's failure to provide a warning after the time of sale or distribution of a product if a reasonable person in the seller's position would provide such a warning.

(b) A reasonable person in the seller's position would provide a warning after the time of sale if:

(1) the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and

(2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and

(continued...)

She also argues that if Sun Lighting had performed the flame tests required by UL in February of 1997 earlier than it did, it would have discovered the simple solution of a wire guard. Had Sun discovered this solution and adopted it, presumably before the sale to her in 1993, the fire would not have happened. This argument is simply another way of saying Sun had a duty to do independent testing before putting the lamp on the market, and, apparently, the duty to perform a specific kind of test. These assertions are unsupported by the law or the facts she presented.

Ms. Irion has also argued that Sun Lighting's failure to test before marketing the product resulted in a lack of knowledge of the inherent dangers of the lamp and a consequent inability to provide adequate warnings. This assertion is part of Ms. Irion's claim that the lamp was unreasonably dangerous because any warnings on it did not adequately apprise her of the dangers. The factual basis for that claim is unclear.

In her Statement of Undisputed Facts,[19] Ms. Irion asserted that UL Standard 153 required the manufacturer to include certain warnings of the dangers associated with the use of the halogen torchiere lamp and that, upon information and belief, the lamp at issue had a label on the inside of the bowl that essentially stated:

> Warning, Unplug lamp before relamping. Risk of fire/injury to persons. Keep away from combustibles. Turn off/unplug to change bulb. Do not touch bulb. Gets hot quickly.

Perhaps because this Statement was later stricken from the record, on appeal Ms. Irion takes the position that there is no proof in the record about the exact warning on the lamp. The record shows that the lamp at issue was UL approved and, therefore, displayed the warning required by UL in the locations required by UL. When UL changed the standards in February of 1997, it stated that lamps meeting the prior standard could be safely used if "used in accordance with manufacturer's use and care instructions." In the face of this proof, Ms. Irion was required to come forward with specific proof that the warnings accompanying the lamp were inadequate. She has failed to meet this burden.

---

[18](...continued)

      (3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and

      (4) the risk of harm is sufficiently great to justify the burden of providing a warning.

[19]Ms. Irion later stated that this document was intended to be her Tenn. R. Civ. P. 56.03 "Statement of Facts as to Which Plaintiff Contends Present Genuine Issues for Trial." Does this change mean that Ms. Irion intended to state that the warning she quoted was not the one on the lamp? In any event, upon motion of the defendants and after argument, the trial court entered an order striking Ms. Irion's "Statement of Facts Which She Contends Present No Genuine Issues for Trial." Consequently, that filing was stricken from the record. Nonetheless, in one of the two orders signed by the judge and entered on August 28, 2001, granting Sun Lighting's motion for partial summary judgment on the punitive damages claims, the court made a finding that the lamp at issue contained a specific warning which was the verbatim duplicate of the one quoted in Ms. Irion's earlier Rule 56 filing.

22

In addition, in Tennessee, a product is not unreasonably dangerous because of a failure to adequately warn of a danger or hazard that is apparent to the ordinary user. Tenn. Code Ann. § 29-28-105(d). The open bowl nature of the lamp's design, and the absence of a wire guard or other measure to prevent direct contact of the bulb with other materials, were obvious to the ordinary user. The fact that a light bulb gets hot is also apparent, and the fact that high wattage halogen bulbs get even hotter is also capable of observation by someone who has used the lamp for four years. The UL warning also warned that the bulb gets hot and should be kept away from combustibles. The post-sale announcements by UL and the CPSC also warn against contact with combustibles.

Ms. Irion has failed to produce evidence that the warnings accompanying the lamp were inadequate. Thus, summary judgment for the defendants was proper on the issue of whether the product was unreasonably dangerous because of inadequate warnings.

Our ruling that Ms. Irion failed to present evidence creating a genuine issue of material fact regarding her allegations that the lamp was in a defective condition or unreasonably dangerous and the defendants are entitled to judgment on those issues either determines the other issues raised by Ms. Irion or pretermits them.[20] Specifically, since liability requires a finding under the Tennessee Product Liability Act of either defective condition or unreasonable danger, the trial court properly dismissed Ms. Irion's claim based on breach of implied warranty.

## X. CONCLUSION

The judgment of the trial court is affirmed and remanded. The costs of this appeal are taxed to the appellant, Gretta Irion.

_____
PATRICIA J. COTTRELL, JUDGE

---

[20]Ms. Irion complains that the trial court erred in denying her motion to amend her complaint to cure the defect in the complaint concerning her punitive damages claims. Even if Ms. Irion had been allowed to amend her complaint, she would not have prevailed on her claims for punitive damages. A party is entitled to recover punitive damages only if there is an award of actual damages. *See Davenport v. Chrysler Credit Corp.,* 818 S.W.2d 23 (Tenn. Ct. App.1991). Failure to prove actual damages precludes recovery of punitive damages. Because the defendants were entitled to judgment as a matter of law with respect to the products liability action, the issue of punitive damages would not have been reached.