# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### August 12, 2014 Session

## DAVID CHAMBERS, ET AL. V. ILLINOIS CENTRAL RAILROAD COMPANY

**Appeal from the Circuit Court for Shelby County**
**No. CT00325210      Robert Samual Weiss, Judge**

---

**No. W2013-02671-COA-R3-CV - Filed May 5, 2015**

---

This appeal arises out of a negligence action brought against a railroad for damage to the plaintiffs' home and storage building during a flood in and around Memphis, Tennessee. Railroad moved for summary judgment on the ground that the negligence claim was preemptioned by federal law and that plaintiff could not prove causation. The trial court initially denied the railroad's motion but, on reconsideration, granted summary judgment; plaintiffs appealed. We reverse the grant of summary judgment and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P. J., W. S., and W. MICHAEL MALOAN, SP. J., joined.

Kristina Alicia Woo and Robert L. J. Spence, Jr., Memphis, Tennessee, for the appellant, David Chambers and Mildred Chambers.

Andrew Shuler DeShazo and Stephanie Camille Reifers, Memphis, Tennessee, for the appellee, Illinois Central Railroad Company.

**OPINION**

## I. FACTS AND PROCEDURAL HISTORY[1]

This case arises out of an action brought by David and Mildred Chambers to recover for property damage suffered as a result of the May 2010 flood in and around Memphis, Tennessee.

Mr. and Mrs. Chambers have lived on Maritavia Drive in North Memphis since 2002; a drainage ditch, between 10 and 14 feet deep and maintained by the City of Memphis, runs parallel to their property. At a point approximately 300 feet beyond the Plaintiffs' property line, a culvert 48 inches in diameter runs under a railroad track at a location identified as mile point 384.20. That culvert, which is owned and maintained by the Illinois Central Railroad Company, channels water into the drainage ditch.

On April 30, 2010, rain began falling in Memphis and the surrounding vicinity; the rain continued virtually unabated over the next 48 hours. At approximately 6:15 a.m. on May 1, the Chambers were awakened by the security alarm in their home; upon investigation Mr. Chambers found twelve to eighteen inches of standing water in the den. A short time later, a fuse box in a commercial storage unit on the property shorted out, triggering a fire which damaged the unit. Most of their appliances, furniture, and personal belongings were destroyed or damaged; they stayed in a hotel for several days and then rented an RV to live in while their home was restored.

On June 29, 2010, David and Mildred Chambers filed suit against the City of Memphis, alleging that the drainage ditch was not properly maintained and, as a consequence, their property flooded after the rainfall. The Plaintiffs amended their complaint to add a claim that the City created a temporary nuisance by failing to maintain the drainage ditch and requested an injunction requiring the City to abate the nuisance. On the basis of information received in discovery from the City, the complaint was amended a second time, joining Illinois Central Railroad Company as a defendant and alleging that Illinois Central had not properly constructed the culvert which adjoined and fed into the ditch or had allowed the culvert to become obstructed, which caused a blockage in the flow of water in the drainage ditch and resulted in the property damage.

Illinois Central answered the complaint, generally denying that the damage was caused by an act or omission of the Railroad; after discovery, Illinois Central amended its answer.

---

[1] Unless otherwise noted, the factual background in this opinion is taken from the pleadings.

In due course, Illinois Central filed a motion for summary judgment on two grounds: first, that plaintiffs' negligence claim was preempted by Illinois Central's compliance with 49 C.F.R. § 213.33 which mandates that "Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned"; and second, that plaintiffs could not prove causation, an essential element of their negligence claim.[2] The Plaintiffs responded to the motion by filing their memorandum, a response to the statement of undisputed facts, and the affidavit of their expert Dr. Charles Morris, a civil engineer. Illinois Central filed a memorandum in response to the Plaintiffs' Response, to which the Chambers filed a Surreply, supported by the Affidavit of Antonio Brown, one of their neighbors.

After a hearing, the court entered an order denying the motion, stating:

1. With respect to federal preemption, the Court finds that there is a material issue of fact in dispute regarding whether Defendant Illinois Central Railroad Company complied with its duty under the applicable federal regulation.

2. With respect to lack of causation, the Court finds that, if the Affidavit of Charles Morris, Ph.D., P.E. (which has been filed in this cause by Plaintiff) is taken as true, Plaintiff has presented evidence for the purpose of opposing Defendant Illinois Central Railroad Company's motion for summary judgment by presenting testimony that the Defendant's culvert pipe had not been properly constructed and/or was obstructed, causing a blockage in the flow of water traveling through the ditch.

Several months later, Illinois Central filed a motion asking the court to reconsider the motion for summary judgment, asserting that, after more discovery, the bases of the denial of the motion were no longer in dispute.[3] Illinois Central asserted that Antonio Brown's deposition testimony did not account for the condition of the culvert immediately prior to the flood and thus did not dispute the testimony of Chris White that he noted no debris when he inspected the culvert and that Illinois Central was in compliance with 49 C.F.R. § 213.33. Illinois Central argued that summary judgment was proper on the grounds of preemption. Illinois Central also asserted that Dr. Morris could not offer an opinion as to whether any act

---

[2] Illinois Central relied upon the affidavits of Scott Taylor, a civil engineer, and Chris White, Illinois Central's track inspector, and a statement of undisputed facts in support of its motion.

[3] In support of its motion, Illinois Central relied on the materials previously filed in support of its motion; additionally, Illinois Central filed the depositions of Antonio Brown and Charles D. Morris and a transcript of the hearing on the summary judgment motion.

or omission by Illinois Central caused the Plaintiffs' property damage, and thus they could not prove causation. The Plaintiffs filed a response, relying on affidavits and depositions to establish genuine issues of material fact as to the condition of the culvert and as to causation.[4]

The court heard arguments and granted Illinois Central's motion. As to preemption, the court held that 49 C.F.R. § 213.33 substantially subsumed the subject matter of the Plaintiffs' state law claim, such that if Illinois Central was in compliance with the regulation, the Plaintiffs' state law claim was preempted. The court found that Chris White had inspected the culvert immediately prior to the alleged flood that occurred on May 1, 2010, and determined that the culvert was free of debris and could handle expected water flow. Because the court found no testimony that contradicted Chris White's account of the condition of the culvert immediately prior to the flood, it held Illinois Central met its burden of proving the affirmative defense of preemption.

The trial court held that expert testimony was required to prove causation; the court found that Dr. Morris "is unable to provide expert testimony evidencing what negligent act on the part of Illinois Central caused the Plaintiffs' alleged injury," and thus could not dispute the testimony of Chris White that the culvert was clear prior to the flood. Consequently, the court held that Illinois Central met its burden of negating an essential element–causation–of the plaintiffs' cause of action. Specifically, the court held that the Plaintiffs could not prove that but for a negligent act of Illinois Central, it was more likely than not the damage alleged would not have occurred.

David and Mildred Chambers appealed, raising one issue: "Whether the trial court erred in applying Tennessee Rule of Civil Procedure 56, and as a result erroneously granted Defendant's, Illinois Central Railroad Company[,] motion to reconsider first motion for summary judgment."[5]

## II. STANDARD OF REVIEW

Summary judgment is appropriate to resolve a case where a party can show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The moving party who does not bear the burden

---

[4] Plaintiffs relied on the affidavits of Charles Morris and Antonio Brown and the depositions of Bobby Baker, Danielle Brown, Antonio Brown, Chris White (two depositions, which were taken April 25, 2013 and July 15, 2013), and Charles Morris, Ph.D., P.E. (including an original amendment sheet correcting errors in the original deposition), as well as precipitation data for April 30-May 1 from the National Climatic Data Center.

[5] Plaintiffs voluntarily dismissed their claims against the City of Memphis.

of proof at trial may accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) showing that the non-moving party will not be able to prove an essential element at trial. *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8–9 (Tenn. 2008).[6]  To negate an essential element of the claim, such as causation, the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party.  *See Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004).  If the moving party is unable to make the required showing, then its motion for summary judgment will fail.  *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993).  Where a defendant asserts an affirmative defense, such as the defense of preemption raised by Illinois Central, as the basis of its entitlement to summary judgment, the defendant bears the burden of alleging undisputed facts that show the existence of the affirmative defense.  *Hannan*, 270 S.W.3d at 9 n.6 (Tenn. 2008).

In either instance, only when the moving party meets its burden does the burden shift to the non-moving party to show that a genuine issue of material fact exists.  *Id.* at 5 (citing *Byrd*).  The non-moving party may show that a material fact is in dispute by: "(1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P. 56.06." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citations omitted).  Summary judgment should be granted only when, with the facts viewed in favor of the nonmoving party, it is clear that no genuine issue of material fact exists. *Id.*

We review the summary judgment decision as a question of law. *Finister v. Humboldt Gen. Hosp., Inc.*, 970 S.W.2d 435, 437 (Tenn. 1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997).  Accordingly, this court must review the record *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair*, 130 S.W.3d at 763 (Tenn. 2004); *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 88 (Tenn. 2000).  In our review, we must consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all reasonable inferences. *Draper v. Westerfield*, 181 S.W.3d 283, 288 (Tenn.2005); *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001).

---

[6] *See also* Tenn. Code. Ann. § 20-16-101, which is applicable to motions for summary judgment in cases filed on or after July 1, 2011; the statute does not apply in this matter.

## III. DISCUSSION

The trial court granted summary judgment on two bases: (a) the state law tort claim was preempted by 49 C.F.R. § 213.33 because the regulation substantially subsumed the subject matter of the negligence claim and because the testimony was uncontroverted that the culvert was free of debris immediately prior to and on May 1, 2010; and (b) the Chambers would not be able to prove causation at trial. We will examine each basis separately.

### A. PREEMPTION

The Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101 et seq., mandated that the Secretary of Transportation prescribe regulations for railroad safety. *See* 49 U.S.C. § 20103(a). The regulations at issue in this case are 49 C.F.R. § 213.33, which requires "[e]ach drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned," and 49 C.F.R. 213.233, which mandates that tracks be inspected, with the frequency of inspections based on the classification of the track.[7]

49 U.S.C. § 20106, entitled "Preemption," includes the following provisions:

(a) National uniformity of regulation.--(1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable**.**

(2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--

    (A) is necessary to eliminate or reduce an essentially local safety
    or security hazard;
    (B) is not incompatible with a law, regulation, or order of the
    United States Government; and

---

[7] According to Chris White's deposition testimony, the classification of the Illinois Central tracks at mile point 384.20 required that inspections be performed twice per week. The classification of the track and the frequency of the inspections are not at issue on appeal.

(C) does not unreasonably burden interstate commerce.

(b) Clarification regarding State law causes of action.--(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party--

(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

(2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

While acknowledging that "courts in Tennessee have not had occasion to comment on the preemptive nature of 49 C.F.R. § 213.33," Illinois Central argues that 49 U.S.C. § 20106 operates to preempt the Plaintiffs' claim because the record shows that it complied with the regulations. The Chambers argue that their claim is not preempted because Illinois Central did not comply with § 213.33 and consequently, 49 U.S.C. § 20106 (b)(1)(A) preserves their claim. A common thread in both the interpretation of the regulation as well as the application of state tort law is the nature of the legal duty imposed on Illinois Central. There is no doubt that 49 C.F.R. § 213.33 establishes both the requirement imposed by the FRSA and the "federal standard of care" referenced in 49 U.S.C. § 20106 (b)(1)(A). The threshold issue, as noted by the trial court in both the initial order denying summary judgment and the subsequent order under appeal, is whether Illinois Central complied with the regulations. By its terms, § 20106 does not preempt the Chambers' claim if Illinois Central has not complied with the regulations. "While preemption is a question of law, whether the railroad was complying with the federal regulation at issue is a question of fact." *Melton v. BNSF Ry. Co*, 322 S.W.3d 174, 190 (Tenn. Ct. App. 2010). Consequently, we proceed to determine whether Illinois Central met its burden to show the absence of an issue of fact that it complied with the federal regulation.

To show that it complied with the regulations, Illinois Central relied on the affidavit of Scott Taylor, a civil engineer, who stated that the culvert was properly constructed to accommodate a 100-year storm, as required by local standards. Illinois Central also relied upon the affidavit of employee Chris White, who stated that he inspected the culvert at mile point 384.20 twice a week, as mandated by 49 C.F.R. §§ 213.233; that it was always clear of obstruction; that he never found debris in the culvert that he could not clear by hand; and that he inspected the culvert at some point during the night of April 30 through early morning of May 1 and found it unobstructed. In support of its motion for reconsideration, Illinois Central filed the deposition of Antonio Brown, which Illinois Central contended contradicted his affidavit, in which he stated that the culvert was clogged with debris immediately prior to the flood; Illinois Central declared the affidavit to be "erroneous" and called on the court to disregard it. The materials relied upon by Illinois Central were evidence that the railroad had kept the culvert unobstructed in compliance with the regulation, thereby shifting the burden to the Plaintiffs to put forth evidence establishing a genuine issue of material fact.

In response, the Chambers relied on the following to establish disputed material facts: the affidavit and deposition of Charles Morris in which he testified that the culvert would have accommodated the rainfall had it been unobstructed; the affidavit and deposition of Antonio Brown, as well as the depositions of Bobby Baker and Danielle Brown, in which each testified that the culvert was in fact obstructed prior to the flood; and the deposition of Chris White, who testified that the culvert was unobstructed and never so clogged that he could not remove the debris with his hands.[8]

In addition to the foregoing, we have reviewed Illinois Central's statement of material and undisputed facts and materials cited therein, and the Chambers' response to the same; the following statements from Illinois Central's Rule 56.03 statement appear to be most pertinent to the issue of compliance with the federal regulation:

5. The Plaintiff's [sic] property flooded on May 1, 2010 as a result of the rainfall.
Response: The Plaintiffs admit that their property flooded on May 1, 2010, but deny that the flooding was caused by the rainfall. The Chambers' property

---

[8] With reference to Mr. White's testimony, the Chambers contended:

Comparing the deposition testimony of Mr. Baker, Mrs. Brown and Mr. Brown versus the testimony of the Defendant employee Mr. White leads but to one conclusion - the existence of a genuine issue of material fact regarding whether the Defendant performed its duty and kept the culvert and the adjacent area free of obstruction to accommodate the flow of water.

flooded because the culvert pipe at issue was not properly constructed and/or was obstructed.

6. Mr. Chambers does not know what caused the flooding of his property to occur on May 1, 2010. [*Deposition of David Chambers*] at 40:5-41:15.
Response: Denied. Mr. Chambers testified that the flooding was caused by the obstruction of the culvert pipe and that the water did not have anywhere to go because the pipe was "stopped with debris."

\*\*\*

12. During these inspections, which included the time period immediately before the alleged flooding occurred, Mr. White observed no debris which prevented the culvert from accommodating the water flow. [*See Affidavit of Chris White.*]
Response: David Chambers testified that, in late February or early March of 2010, he personally inspected the culvert pipe at issue, which was close to his home, and observed the culvert pipe to be ninety five percent (95%) blocked. Mr. Chambers testified that, from the date that he observed the culvert pipe to be obstructed, to the date that his property was flooded, he constantly looked at the culvert pipe. Mr. Chambers also testified that from the date he observed this obstruction in late February or early March 2010 to May 1, 2010 – the date of the flooding – he never observed any changes in the condition of the culvert pipe.

In David Chambers's deposition, he testified about the "stopped up" condition of the culvert in the days prior to the flood:

Question: So, isn't it correct that you did not personally observe the pipe on May 1st, 2010?
Answer: I don't – I don't – could you – could – how can you observe a pipe in 12 foot of water?
Question: So the answer to my question would be, correct, you did not look at the pipe on May 1st, 2010, correct?
Answer: I didn't look at it on May the 1st in 12 foot of water. No ma'am.
Question: Okay. And had you looked at the pipe the week before the flood?
Answer: Oh yes. I constantly looked at that pipe up until the day of the flood, from February when I – when I – when I– when I found out that the pipe was stopped up, I constantly looked at the pipe. And that's the reason I called.

Danielle Brown, a neighbor of the Chambers whose property also adjoined the drainage ditch, testified as follows:

> Question: Okay. Is it fair to say that you had not been down to look at the drainage ditch and culvert the day before the flood?
> Answer: I always looked at the drainage ditch area.
> Question: And what, if anything, had you observed, if you recall, about the drainage ditch the day before the flood?
> Answer: The same things: Debris and trash and limbs and trees in there.
> Question: Is it fair to say you had not observed the culvert, the condition of the culvert the day before the flood?
> Answer: Like I said, to me, when I'm looking at it, it's all associated with the same thing and I'm calling it all a drainage pipe. I can't tell you what was actually in the culvert, culvert, whatever it's called.
> Question: What, if anything [c]an you tell me if anything was in the culvert?
> Answer: I can tell you that it was trees and limbs and things like that all around that area.
> Question: I understand that, but isn't it fair to say you cannot testify whether there was anything inside the culvert the day before the flooding?
> Answer: I can't say that because, like I said, it's a lot – it was a lot going on back there. All I know, it was all associated in that area and that's what I seen in that area and that's what I was complaining about.

Antonio Brown, husband of Danielle Brown, testified, after he learned the difference between the drainage ditch and the culvert, that debris was blocking the entrance of the culvert.

> Question: And now that you know what the culvert pipe is, Mr. Brown, which is that concrete pipe underneath the railroad tracks.
> Answer: Yeah.
> Question: In your opinion today, were there sticks, trash, and debris blocking the entrance of that culvert pipe?
> Answer: There was sticks, debris and the whole –the whole drainage ditch in the whole thing in the – right to the – all the way to the end of it, as far as I could see from the front all the way down.
> Question: And when you say to the end, do you mean all the way to the culvert pipe?
> Answer: Uh-huh.

Question: Is that a yes?
Answer: Yes.[9]

As is apparent, the parties presented conflicting accounts of the condition of the culvert at the relevant time period. As the Tennessee Supreme Court has instructed, "If reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists." *Green v. Green*, 293 S.W.3d 493, 514 (Tenn. 2009) (citing *Martin*, 271 S.W.3d at 84; *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 649, 656 (Tenn. Ct. App. 1993). Taking the evidence in the light most favorable to the Plaintiffs, whether or not the Defendant was in compliance with 49 C.F.R. §§ 213.233 is disputed.

Where there is a factual dispute, we must also determine whether the fact is material to the claim or defense and whether the disputed fact creates a genuine issue for trial. *Byrd*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed. *Byrd*, 847 S.W.2d at 215. Whether Illinois Central complied with the regulation is a question of fact that must be settled before the court can determine whether Plaintiffs' claim is preempted and, thus, is material. Because the facts are in dispute as to whether Illinois Central complied with the regulation, Illinois Central was not entitled to summary judgment on the ground of preemption.

---

[9] We disagree with Illinois Central's position that Antonio Brown "repudiated" his affidavit in his deposition and contention that his testimony should be disregarded by the court. In his affidavit, he stated that "On April 30, 2010, I observed the culvert pipe at issue in this case to be clogged with sticks, trash, and part of a large tree." Illinois Central asserted that, when deposed, he testified that he "never really paid attention to [the culvert]" and never looked into it. In the specific portions of the deposition cited, Antonio Brown testified, "I never paid much attention to it" and clarified that he "[s]aw it like that and just kept on about my day." Read together with his other testimony that he walked down to the culvert the day before the flood and saw that the drainage ditch leading up to the area immediately outside the culvert pipe was filled with trash, sticks, debris, and even a tree stump, such that he could not see inside of it, we fail to see any contradiction between Antonio Brown's affidavit and deposition testimony. In any event, our Supreme Court has characterized "mutually contradictory statements by the same witness as 'no evidence' of the fact sought to be proved." *Church v. Perales*, 39 S.W.3d 149, 170 (Tenn. App. 2000). "To be disregarded under the so-called cancellation rule, the allegedly contradictory statements must be unexplained and neither statement can be corroborated by other competent evidence." *Id.* Because Mr. Brown's testimony regarding the area surrounding the culvert can be corroborated by the testimony of David Chambers and other neighbors, it should not have been disregarded by the trial court in its consideration of the evidence when determining whether a disputed material fact existed.

### B. CAUSATION

To prevail on a claim of negligence, the Plaintiffs must prove "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005). A defendant's conduct is the "cause in fact of the plaintiff's injury if, as a factual matter, it directly contributed to the plaintiff's injury. . . . [W]e must ask whether the plaintiff's injury would have happened 'but for' the defendants' act." *Id. Hale*, 166 S.W.3d at 718. It is well established that "[c]ause in fact and proximate cause are 'ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome.'" *Id.* at 718 (quoting *Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. 1994)); *see McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991); *Pullins v. Fentress Cnty. Gen. Hosp.,* 594 S.W.2d 663, 671 (Tenn. 1979).

In its order granting summary judgment, the trial court stated:

> The question of causation in this matter must be proven by expert testimony. More particularly, whether a negligent act of Illinois Central with respect to the design, capacity, and/or maintenance of the culvert caused the damage alleged implicates problems that must be answered by the specialized knowledge, education, and training of a civil engineer which is outside the scope of a layperson's knowledge.

With respect to maintenance of the culvert, the court held that because the Plaintiffs' expert did not know if the culvert was previously obstructed or if the flood washed debris into the culvert, they were unable to prove causation. Further, the Court held that because Dr. Morris had no opinion on how or when the culvert became blocked, the testimony of lay witness Chris White that the culvert was clear prior to the flood was undisputed.

As an initial matter, we disagree that expert testimony was required to establish causation in this matter. As our Supreme Court has observed, "Most people of average intelligence know how water flows and that a ditch facilitates the flow, even though they may not understand all of the natural forces that make it do so." *Lawrence County Bank v. Riddle*, 621 S.W.2d 735, 737 (Tenn. 1981). We agree that expert testimony with respect to the design and capacity of the culvert would assist the trier of fact in determining whether the culvert could accommodate the expected water flow, as required by 49 C.F.R. § 213.33. In this regard, the court held that both parties' experts "are in agreement that Illinois Central's culvert was designed to handle greater than a 100 year flood event"; that holding, related to the duty

imposed on Illinois Central, is not challenged on appeal. The question of whether the culvert was clogged and, if so, whether the clogging caused water to be unable to get through the culvert and the ditch, does not require expert testimony; it is a conclusion which can be reached on the basis of the testimony of lay witnesses.

Illinois Central, as the movant, was required to negate an essential element of the plaintiffs' claim or show that the Chamberses could not prove an essential element of the claim at trial. *Hannan*, 270 S.W.3d at 8-9. We must first determine whether Illinois Central's motion was properly supported with evidence that showed the Chamberses would be unable to prove causation.

Illinois Central relies on the deposition testimony of Dr. Morris to show that Mr. and Mrs. Chambers could offer no expert opinion as to what specific action or omission by the railroad caused the culvert to be blocked prior to the flooding. Specifically, they rely on the following testimony:

> Question: Do you have any opinions with regard to whether or not there was an obstruction of the culvert before the flooding began?
> Answer: I don't know. I do not have any opinion. It could have been plugged during the flood. It could have been plugged before. I don't know. All I know is it was plugged during the event.
> Question: And it's reasonable, isn't it, to believe that the flood, the precipitation that was occurring, washed items down to the culvert?
> ***
> Answer: I think that's a possibility, yes. Material does move during a flood event.

We have reviewed the entirety of Dr. Morris' deposition and do not agree that it shows, in conjunction with other evidence in the record, that there is not an issue of material fact on causation.

In addition to Dr. Morris' testimony, the Plaintiffs relied on the depositions of Bobby Baker, Danielle Brown, and Antonio Brown, as well as precipitation data for the area from April 30 through May 1 from the National Climatic Data Center, to establish an issue of material on causation. Danielle Brown and Antonio Brown, quoted earlier in this opinion, testified that the culvert was clogged with debris prior to the flood; Bobby Baker, a neighbor whose property also adjoined the drainage ditch, likewise testified that the culvert was 75 percent blocked in the months prior to the flood.

The following statements from Illinois Central's Rule 56.03 statement of undisputed facts and the Chambers' responses appear to be most pertinent to the issue of causation:

5. The Plaintiff's [sic] property flooded on May 1, 2010 as a result of the rainfall.
Response: The Plaintiffs admit that their property flooded on May 1, 2010, but deny that the flooding was caused by the rainfall. The Chambers' property flooded because the culvert pipe at issue was not properly constructed and/or was obstructed.

6. Mr. Chambers does not know what caused the flooding of his property to occur on May 1, 2010. [*Deposition of David Chambers*] at 40:5-41:15.
Response: Denied. Mr. Chambers testified that the flooding was caused by the obstruction of the culvert pipe and that the water did not have anywhere to go because the pipe was "stopped with debris."

***

15.The culvert located at Mile Point 384.20 as of May 1, 2010, which was 48 (forty-eight) inches in diameter, could accommodate the expected water flow for the area which would accumulate as a result of a 100 year event. [*See Affidavit of Scott Taylor.*]
Response: The Plaintiffs admit that, had the culvert pipe been properly constructed and/or unobstructed during the May 1, 2010 rainfall, it would have accommodated the water flow, but the culvert piped was not properly constructed and/or obstructed.

Dr. Morris' uncontradicted testimony that the culvert would have accommodated the water, had it been unobstructed, is evidence of causation; by implication, if the culvert were not obstructed, the water would have flowed and not flooded. He could not say whether the obstruction occurred prior to or during the flood. Antonio Brown, Danielle Brown, and Bobby Baker all testified that the culvert was obstructed in the weeks prior to the flood. David Chambers testified that two to three feet of standing water stayed in the drainage ditch at all times; that, early in 2010 he investigated to see what was preventing the water from draining; that he saw the culvert and estimated that it was 95 percent blocked; and that the condition of the culvert remained unchanged until it was replaced by the railroad on May 2, 2010, as a result of which the water receded.

Taken together, the testimony of Dr. Morris, David Chambers, and his neighbors creates a genuine issue of material fact as to whether, and the extent to which, the culvert was obstructed such that the water could not pass through, thereby causing the flood. Illinois

Central failed to establish that the plaintiffs cannot prove an essential element of their claim at trial and was not entitled to summary judgment on the basis of causation.

## IV. CONCLUSION

For the foregoing reasons, we reverse the grant of summary judgment and remand the matter for further proceedings.

_____
RICHARD H. DINKINS, JUDGE